PRESENT:  Lemons, C.J., Goodwyn, Mims, McClanahan, Powell, and Kelsey, JJ., and Millette, S.J.

RICHARD S. LEVICK

v.  Record No. 160540

DEBORAH MACDOUGALL

DEBORAH MACDOUGALL

v.  Record No. 160551

RICHARD S. LEVICK

OPINION BY
JUSTICE D. ARTHUR KELSEY
November 2, 2017

FROM THE COURT OF APPEALS OF VIRGINIA

Richard S. Levick and Deborah MacDougall married in 2002.  During a divorce proceeding 10 years later, Levick asserted — for the first time — that their marriage was void ab initio.  On this ground, Levick claimed that he could repudiate a marital agreement requiring him to pay spousal support and to distribute the marital assets.

The circuit court agreed in full with Levick's reasoning.  The Court of Appeals agreed only in part, holding that the marriage was merely voidable, not void ab initio.  We disagree entirely with Levick's reasoning and hold that the marriage was not voidable or void ab initio.  The circuit court, therefore, had authority to distribute the marital assets consistent with the marital agreement and to continue its adjudication of the divorce proceeding.

I.

On December 21, 2002, Levick and MacDougall participated in a wedding ceremony in their home in the presence of friends and family.  Before the ceremony, the officiating rabbi discovered that the parties had not yet obtained a marriage license.  The rabbi suggested that Levick and MacDougall participate in the ceremony that day as long as they obtained a marriage license and submitted the marriage certificate to the rabbi as soon as possible.  On January 6,

2003, MacDougall went to the courthouse with Levick to obtain the license. *See* 2 J.A. at 673, 679, 802.[1] Levick told MacDougall that he would mail the marriage register out right away to the rabbi, and she agreed and kissed him goodbye. *See id.* at 683, 803. After the rabbi received the marriage register, which included the license and certificate, he executed the marriage certificate and verified that the parties were married on the date of execution, not the prior date of the ceremony in their home.[2]

As the rabbi explained in his testimony, he was "completing" the solemnization that began with the ceremony. 3 *id.* at 979. His receipt of the marriage register in the mail from Levick and MacDougall demonstrated the couple's "intention . . . to complete the ceremony." *Id.* at 983. Levick conceded in the proceedings below that "[their] intention was to be *legally* married," *when* he and MacDougall followed the rabbi's instructions, obtained the license, and mailed the marriage register to the rabbi. *See id.* at 773-76 (emphasis added). Levick understood that they "needed a license and it had to be signed by the rabbi" and that "it was *necessary* to do [so] in order to be *lawfully* married." *Id.* at 776 (emphases added). In response to a question asked by Levick's counsel about whether she thought that she was married on December 21, 2002, MacDougall responded that she "didn't think that it was over" on December 21 because the rabbi "had told [them] what [they] had to do," and if she "thought it was all

---

[1] The record in this case has been sealed by order of the circuit court, *see* R. at 4275, and one of the five joint appendices filed in this appeal has been sealed by order of this Court. To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed.

[2] Levick and MacDougall obtained the license on January 6, 2003, approximately two weeks after their ceremony. Levick then mailed the marriage register to the rabbi on behalf of himself and MacDougall, thereby ratifying and republishing to the officiant their intent to marry. Because the rabbi was out of town at the time, he did not receive the marriage register until January 21, 2003. He executed the marriage certificate on January 21, identified the date of marriage as January 21, and later returned the marriage register to the clerk's office.

finished, then [she] wouldn't have gone to the Courthouse" thereafter to obtain the marriage license. *Id.* at 825-26. Under their agreement, the ultimate expression of their solemn intent to marry was their act of forwarding the marriage register to the rabbi for the sole purpose of him acknowledging that intent by executing the marriage certificate. The rabbi identified the date of the marriage as the date that he received the marriage register and executed the marriage certificate. *See supra* at 2 & note 2.

In 2009, the marriage began to deteriorate. Levick and MacDougall entered into a marital agreement to "form the foundation of a divorce or separation agreement, should either come to pass." 1 J.A. at 3. If either did occur, Levick agreed to pay MacDougall $150,000 in spousal support annually and pay for her health insurance premiums for the remainder of her lifetime. Levick also agreed to divide equally the proceeds from the sale of the marital home, and, in the event that he sold his company, MacDougall would receive 35% of the proceeds.

The parties filed for divorce in 2011. Nearly two years into the divorce litigation, Levick filed a motion arguing for the first time that the marriage was void ab initio — that is, a "complete nullity" under the law, *Jones v. Commonwealth*, 293 Va. 29, 53, 795 S.E.2d 705, 719 (2017) (citation omitted) — because they had obtained the marriage license 16 days after the marriage ceremony in their home.[3] This time lapse, he contended, violated Code § 20-13 and rendered the marriage void ab initio, thus placing him outside the equitable powers of the divorce court and allowing him to repudiate his marital agreement. The circuit court agreed and rejected MacDougall's arguments in support of enforcing the marital agreement.

---

[3] Levick's fortuitous late discovery of this basis for challenging his marriage is accentuated by his testimony that he believed they "were properly and legally married" up until he learned in the midst of the divorce litigation that the date on the marriage certificate was different than the date of the wedding ceremony in their home. *See* 2 J.A. at 768.

3

On appeal, the Court of Appeals agreed that the ceremony-before-license sequence violated an implied term in Code § 20-13 but rejected the circuit court's conclusion that the violation rendered the marriage void ab initio. *See MacDougall v. Levick*, 66 Va. App. 50, 69-70, 782 S.E.2d 182, 191-92 (2016). Treating the marriage as merely voidable, the Court of Appeals nonetheless affirmed the circuit court's decision to hold the marital agreement ineffectual and rejected MacDougall's assertion that, under equitable principles, the agreement should be enforced even if the marriage was voidable. *See id.* at 81-84, 782 S.E.2d at 197-98.

## II.

On further appeal to this Court, MacDougall argues that Code § 20-13 does not mandate a precise sequence for performing the marriage ceremony and obtaining the marriage license. To be sure, she points out, the statute does not mention a marriage "ceremony" at all. Instead, the statute addresses only the broader concept of solemnization. She adds that, even if this Court were to infer a particular sequence for the license and solemnization requirements, a violation of that judicially implied requirement would not render her marriage to Levick either void ab initio or voidable.[4]

## A.

We begin our analysis where it will eventually end — with the first premise of Virginia law governing marriages: "The public policy of Virginia . . . has been to uphold the validity of the marriage status as for the best interest of society," *Needam v. Needam*, 183 Va. 681, 686, 33 S.E.2d 288, 290 (1945), and thus, the presumption of the validity of a marriage ranks as "one of the strongest presumptions known to the law," *Eldred v. Eldred*, 97 Va. 606, 625, 34 S.E. 477,

---

[4] Our holding addresses the arguments in both consolidated cases, Levick's appeal in Record No. 160540 (arguing that the marriage was neither valid nor voidable but, rather, void ab initio) and MacDougall's appeal in Record No. 160551 (arguing, among other things, that the marriage was valid and neither voidable nor void ab initio).

484 (1899).  This presumption is not unique to our Commonwealth.  "[I]t will be readily conceded that English and American tribunals tend, in construing the marriage acts, to uphold every marriage, if possible, notwithstanding a non-compliance with the literal forms."  2 James Schouler & Arthur W. Blakemore, A Treatise on the Law of Marriage, Divorce, Separation and Domestic Relations § 1191, at 1446 (6th ed. 1921).  In our opinion, this robust presumption withstands all of Levick's arguments against it.

Levick's main argument is quite simple:  A marriage license must *precede* the marriage ceremony, and the marriage is void ab initio if this sequence is not followed.  While we admire the brevity of Levick's reasoning, it illustrates well the trenchant aphorism, often attributed to Albert Einstein, that "[e]verything should be made as simple as possible, but not simpler."[5] Levick's argument evades a set of conceptually complex yet necessary legal questions:  What are the essential attributes of solemnization?  Does solemnization necessarily end at the last moment of the marriage ceremony?  Are "solemnization" and "ceremony" exact synonyms, or is the latter simply evidence of the former?  Can the officiant and the celebrants agree to extend solemnization for a brief period of time after the ceremony ends and, during that period, obtain the marriage license and execute the marriage certificate?

To answer these questions, we start with the text of Code § 20-13:  "Every marriage in this Commonwealth shall be under a license and solemnized in the manner herein provided." That is a rather slow start, however, because there is no specific "manner herein provided" anywhere in the Code of Virginia.  As Levick concedes, nothing in Code § 20-13 expressly indicates that the license and solemnization requirements must be performed in any particular

---

[5] The Ultimate Quotable Einstein 475 (Alice Calaprice ed., 2011).

order for the marriage to be valid. *See* Appellee's Br. at 12.[6] Nor does any provision of the Code limit solemnization only to a ceremony.

In this case, the celebrants and the officiant agreed upon the manner in which they intended to solemnize the marriage. Based on that understanding, Levick and MacDougall obtained the license together and mutually agreed that Levick would mail the marriage register to the rabbi right away. By doing so, they reasserted their mutual intent to marry. On the date that the rabbi executed the marriage certificate, not the date of the earlier ceremony, the marriage began because solemnization was complete pursuant to their agreement. As the rabbi explained, he was "completing" their solemnization agreement that began with the ceremony and ended when he received the marriage register and executed the marriage certificate. 3 J.A. at 979.

We know of no statute or opinion of this Court forbidding the celebrants and the officiant from agreeing to this particular manner of solemnization. While it may be unconventional, it should not be judicially deemed unlawful (much less void ab initio) unless the General Assembly has expressly declared it to be so. The legislature, however, has chosen not to micromanage the details of solemnization. Nor have we.

Under our precedent, "no particular form of marriage ceremony is required," *Alexander v. Kuykendall*, 192 Va. 8, 11, 63 S.E.2d 746, 748 (1951), because Virginia "has no official interest" in the details of "the ceremony or ritual which surrounds the act," *Cramer v. Commonwealth*, 214 Va. 561, 565, 202 S.E.2d 911, 914 (1974). What matters is the solemnity of the celebrants' representations to the officiant of their sincere intent to marry. *See id.* ("The interest of the state is not only in marriage as an institution, but in the contract between the parties who marry, and in the proper memorializing of the entry into, and execution of, such a

---

[6] All citations to briefs reference those filed in MacDougall's appeal, Record No. 160551.

6

contract."). For the purposes of solemnization, a ceremony merely serves to authenticate the parties' intent to marry.

Levick contends that no precedent expressly authorizes the unconventional solemnization that he, his wife, and the rabbi agreed to complete in advance. *See* Appellee's Br. at 18-20; *see also post* at 22. True enough. But that contention inverts the burden of proof. As the party challenging the validity of his marriage, Levick bears the burden of proving that it violates Virginia law. *See Parker v. American Lumber Corp.*, 190 Va. 181, 185, 56 S.E.2d 214, 216 (1949). He attempts to shoulder that burden by asserting that Code § 20-13 requires every marriage in Virginia to be licensed and solemnized. Again, this statement is true. But, as the marriage certificate attests, the couple was married on January 21, 2003 — 15 days *after* he and MacDougall reaffirmed their mutual intent to marry by forwarding their marriage license to the rabbi pursuant to their earlier agreement.[7]

For over half of a century, Attorneys General of Virginia have been of the opinion that "Virginia law does not require that the parties to a marriage be in the presence of each other, or in the presence of the person officiating at the ceremony, for the marriage to be valid." 1987-1988 Op. Atty. Gen. 316, 317-18; *see also* 1959-1960 Op. Atty. Gen. 219, 220-21 (stating that "[t]he Virginia statute does not provide that both the parties must be in the presence of the

---

[7] Before the circuit court and the Court of Appeals, Levick relied upon an unpublished, per curiam opinion from the United States District Court of the Virgin Islands, *In re Khalil*, No. 2001/183, 2003 U.S. Dist. LEXIS 6229 (D.V.I. Apr. 4, 2003). In that case, the federal district court interpreted a marriage statute of the Virgin Islands. The Supreme Court of the Virgin Islands, however, later repudiated *Khalil* as an erroneous interpretation of its marriage statute. *See Hamed v. Hamed*, 63 V.I. 529, 540 (2015). Holding that "the fact that [the couple] failed to obtain a license prior to solemnization of their marriage — without more — did not render their marriage invalid," the Supreme Court of the Virgin Islands rejected *Kahlil*'s judicial interpolation of such a requirement into the marriage statute. *Id.* at 542. That court further discounted *Khalil* as an unpublished, per curiam opinion, which, as the court issuing *Khalil* had "itself decreed," should be regarded as having no "precedential value." *Id*.

7

officiating minister when the marriage is solemnized," and thus, "[i]n the absence of a statutory requirement that the parties be in the presence of each other when entering into [a marriage], it would seem that the agreement may be completed at long distance").[8]

It is unnecessary in this case to determine what qualifications or limiting principles apply to the opinions of the Attorneys General. For the present, it is enough to simply observe that if the views of the Attorneys General are even half-right, the solemnization agreement in this case (a ceremony followed shortly thereafter by the issuance of a marriage license, the joint presentation of the marriage register to the officiant, and the officiant's execution of the marriage certificate) did not violate any existing Virginia statute or case law. The "principal objects" of statutes similar to Code § 20-13, which require a license and solemnization for a valid marriage, "are to insure publicity and preserve evidence of marriages." Joseph R. Long, A Treatise on the Law of Domestic Relations § 60, at 99 (2d ed. 1913).[9] The solemnization in this case satisfied both of those objects.

---

[8] The dissent relies upon an unpublished Court of Appeals opinion, for the proposition that "whatever formalities the [solemnization] requires, at the very least it requires the attendance of both the prospective bride and groom." *Post* at 31 n.13 (alteration in original) (quoting *Davidson v. Davidson*, No. 2356-08-3, 2009 Va. App. LEXIS 313, at *5 (July 14, 2009)). *Davidson* is completely dissimilar from the present case. To begin, the dissent substitutes "solemnization" for the word "ceremony" in the *Davidson* opinion — two words that both the majority and dissent agree should not be treated as exact synonyms. *See supra* at 9-11; *see also post* at 24 n.3. Second, the ceremony was the only evidence of solemnization in *Davidson*, which is not true here. Finally, the bride in *Davidson* made an agreement with the officiant after the ceremony and outside the presence of the groom to re-sign the marriage certificate with a later date of marriage. In this case, both celebrants and the officiant agreed *before* the ceremony to an alternative solemnization.

[9] *See, e.g.*, *Bowman v. Bowman*, 24 Ill. App. 165, 172 (1887) ("We think the word 'solemnized,' as used in our statute, is not to be construed as meaning only a ceremonial solemnization, whether religious or official . . . ."); *Dyer v. Brannock*, 66 Mo. 391, 396-97, 417-18 (1877) (upholding the validity of a marriage solemnization in which the couple merely announced before several family members and strangers their agreement to live together as husband and wife, "to which they both assented by an inclination of the head"); *Pearson v.*

B.

Levick's contrary view — that "ceremony" and "solemnization" should be treated as exact synonyms — fails to take into account that the Code of Virginia uses the two words for different purposes in different contexts. *Compare, e.g.*, Code § 32.1-267(C) (requiring a "person who officiates at a marriage ceremony" to file the marriage certificate "within five days after the ceremony"), *with, e.g.*, Code § 20-13 (stating that "[e]very marriage in this Commonwealth shall be under a license and solemnized in the manner herein provided"). Although the rabbi may have violated Code § 32.1-267(C) by not filing the marriage certificate within five days of the marriage ceremony that he officiated, neither that statute nor any other statute mandates that the *officiant's* violation voids the *celebrants'* marriage. They have no control of whether he files the certificate five, six, or sixty days later. The legal validity of their marriage cannot be so easily extinguished.

Levick disagrees, arguing that the General Assembly intended for the marriage to be judicially declared void if the issuance of the license does not precede the "solemnization ceremony." Appellee's Br. at 20; *see also id.* at 57. However, the term "solemnization" does not appear in Code § 32.1-267(C), and the term "ceremony" does not appear in Code § 20-13. The dissimilar use of these terms implies that the General Assembly has declined to adopt a specific definition for solemnization, leaving the details to the discretion of the officiant and the celebrants.[10] If we were to transpose "ceremony" for "solemniz[ation]" in Code § 20-13, we

---

*Howey*, 11 N.J.L. 12, 17-21 (1829) ("It was never held essential to the validity of the [marriage] contract that it should be made in any particular place, or in the presence of one person more than another, provided that it could be sufficiently proved.").

[10] Our colleagues in dissent rely on Black's Law Dictionary to determine the meaning of "solemnization," *see post* at 28 & n.9, but the definition of "solemnization" requires "a formal ceremony . . . before witnesses," Black's Law Dictionary 1607 (10th ed. 2014). Neither a formal

9

would effectively amend the statute in a manner inconsistent with our traditional role as mere expositors and not makers of the law.[11]

Levick also makes much of the fact that the rabbi violated Code § 20-28, which prohibits an officiant from "perform[ing] the ceremony of marriage without lawful license." Perhaps the rabbi did violate the statute. But his violation of Code § 20-28 does not affect the only two requirements to create a valid marriage under Code § 20-13 — a license and solemnization. "[L]egislation commanding formalities, even punishing those who celebrate marriage contrary to its provisions, or punishing the parties themselves, will not render a marriage had in disregard of it void, unless the statute expressly or by necessary implication declares this consequence." 1 Joel Prentiss Bishop, New Commentaries on Marriage, Divorce, and Separation § 449, at 192 (1891); *see also* 2 James Kent, Commentaries on American Law 86-92 (1827) (noting that violations of various statutory regulations of marriage, while they may impose penalties on the officiant, do not ultimately affect the validity of the marriage).[12]

Finally, Levick turns to Code § 20-14.1, which states in part that a marriage license constitutes "authority for a period of only sixty days from the date of issuance for the

---

ceremony nor witnesses, however, are required by Virginia law. While these requirements may exist in other jurisdictions, this dictionary definition is inconsistent with Virginia law.

[11] *See generally Gilliam v. McGrady*, 279 Va. 703, 709, 691 S.E.2d 797, 800 (2010) ("It is not the function of the courts to add to or amend clear statutory language."); *Signal Corp. v. Keane Fed. Sys.*, 265 Va. 38, 46, 574 S.E.2d 253, 257 (2003) ("In this Commonwealth, courts are required to apply the plain meaning of statutes, and we are not free to add language, nor to ignore language, contained in statutes."); *Anderson v. Commonwealth*, 182 Va. 560, 566, 29 S.E.2d 838, 841 (1944) ("Courts are not permitted to rewrite statutes.").

[12] *See, e.g.*, *Haggin v. Haggin*, 53 N.W. 209, 211 (Neb. 1892) ("[A]lthough a license is required [to perform a ceremony], yet a failure to procure the same, although it may render the person performing the ceremony liable, will not of itself affect the validity of the marriage."); *Martin v. Ryan*, 2 Pin. 24, 25 (Wis. 1847) ("[I]f the person officiating had failed to comply with the law in the particular mentioned, the only consequence would be his exposure to the penalty of the law.").

solemnization of a marriage of the licensees." The marriage license issued to Levick and MacDougall, however, was obtained 15 days prior to the culmination of their solemnization agreement — the day on which the rabbi received the marriage register and executed the marriage certificate as promised. Code § 20-14.1 does not address, much less prohibit, the unique sequence agreed to by Levick, MacDougall, and the rabbi. Levick's reliance on Code § 20-14.1 thus rests on the unproven assumption that the last moment of their ceremony ended solemnization as a matter of law.

In short, Levick has not rebutted the strong presumption favoring the validity of his marriage. Given the absence of any statute or controlling precedent requiring that his marriage be declared void, we have no authority to do so.[13]

## III.

### A.

On several points, we must regrettably part company with our dissenting colleagues. As noted earlier, Code § 20-13 does not say anything about the required manner and sequencing of solemnization. Nor do any other statutes require that a marriage in violation of the dissent's

---

[13] So strong is the presumption of validity that, even when it is rebutted, the General Assembly protects marriages from being judicially invalidated in circumstances analogous to, though not identical with, the circumstances in this case. Entitled "Belief of parties in lawful marriage validates certain defects," Code § 20-31 provides:

> No marriage solemnized under a license issued in this Commonwealth by any person professing to be authorized to solemnize the same shall be deemed or adjudged to be void, nor shall the validity thereof be in any way affected on account of any want of authority in such person, or any defect, omission or imperfection in such license, if the marriage be in all other respects lawful, and be consummated with a full belief on the part of the persons so married, or either of them, that they have been lawfully joined in marriage.

11

view of solemnization be judicially declared void ab initio — a remedy the General Assembly usually makes quite clear when it intends the courts to award it. *See, e.g.*, Code § 20-43 (declaring bigamous marriages "absolutely void"). Because our duty "is not to make law, but to construe it," *Saville v. Virginia Ry. & Power Co.*, 114 Va. 444, 452, 76 S.E. 954, 957 (1913), we resist Levick's invitation to interpolate into the marriage statutes an unwritten solemnization requirement that, if violated, would treat a marriage as void ab initio, a legal nullity subject to challenge at any time by anyone.[14]

That said, the unusual fact pattern of this case allows us to occupy a narrow patch of common ground with our dissenting colleagues. They concede that "[a]s long as this consent to be married is presently expressed to and, at the same time, received by the officiant when the celebrants possess a marriage license, a valid marriage is created." *Post* at 30. We agree. That is what happened in this case pursuant to the agreement between the rabbi and the parties.

MacDougall went to the courthouse with Levick to obtain the license, and he told her that he would mail it out right away to the rabbi, to which she agreed before kissing him goodbye. *See* 2 J.A. at 673, 679, 683, 803. MacDougall testified that "[f]orwarding the license was [their] communication to [the rabbi]." *Id.* at 820. The rabbi similarly confirmed that, upon receiving the marriage register sent by Levick and MacDougall in order to execute the marriage certificate,

---

[14] We are also unpersuaded by the dissent's reliance on cases declaring marriage statutes to be mandatory rather than directory. The cases cited by the dissent address *express statutory requirements*, just as this Court addressed in *Offield v. Davis*, 100 Va. 250, 256, 40 S.E. 910, 912 (1902), instead of judicially constructed inferential interpretations. *See Pinkhasov v. Petocz*, 331 S.W.3d 285, 294 (Ky. 2011) (construing a Kentucky marriage statute to require a license before solemnization, which stated that "[n]o marriage shall be solemnized without a license therefor" (citation omitted)); *Roe v. Ludtke Trucking*, 732 P.2d 1021, 1023 (Wash. Ct. App. 1987) (finding that a woman, who merely cohabitated with a man, was not the man's wife for the purposes of a wrongful death claim because "a marriage can be created only by compliance with the statutory provisions"); *Kisla v. Kisla*, 19 S.E.2d 609, 609-11 (W. Va. 1942) (finding that a marriage solemnized in West Virginia with a Pennsylvania marriage license was not "under a license and solemnized" as required by the West Virginia Code).

Levick and MacDougall irrefutably demonstrated to him their "intention . . . to complete the ceremony." 3 *id.* at 982-83. Levick further conceded in the proceedings below that "[their] intention was to be legally married" when he was asked whether his "intention in complying with the instructions of [the rabbi] was to fulfill the [rabbi's] requirements" so that he "could be legally married." 2 *id.* at 773-74; *see also id.* at 776.

Solemnization, therefore, occurred when Levick and MacDougall obtained the marriage register and forwarded it to the rabbi pursuant to their agreement, which they made with him in person at the earlier ceremony, and the rabbi thereafter executed the marriage certificate in accordance with their agreement. By doing so, Levick and MacDougall repeated and reaffirmed to the officiant their joint, unqualified intent to marry — an intent that Levick has never once disavowed. Nothing in any statute or case law forbids Levick and MacDougall from verifying their intent to marry in this manner.[15]

B.

On several fronts, the dissent's characterization of our holding goes too far, requiring us to repeat Justice Ginsburg's observation that "Cassandra-like predictions in dissent are not a sure

---

[15] The dissent quotes from Bishop's marriage treatise, which states that "marriage cannot be in abeyance," *post* at 22 (quoting 1 Bishop, *supra*, § 347, at 144), because "the consent must be to *present* marriage, not depending on a future condition, or to be for an instant postponed," *post* at 30 (emphasis in original) (quoting 1 Bishop, *supra*, § 238, at 103). This consent requirement "render[s] competent parties husband and wife," the dissent posits, because the parties "must . . . mutually agree *in the present tense to be such*," *post* at 30 (emphasis in original) (quoting 1 Bishop, *supra*, § 299, at 124), and the celebrants must "represent to the officiant" this "mutual, sincere present consent" for "proper solemnization," *post* at 29 (citing 1 Bishop, *supra*, § 439, at 189). We agree with Bishop. But we disagree with the dissent's assertion that Levick and MacDougall somehow failed to express their *present* intent to marry when they jointly forwarded the marriage register to the rabbi pursuant to their agreement. It is factually incontestable that their act of doing so was both a present, unqualified expression of their intent to marry as well as a joint request for the rabbi, upon his receipt of the register, to execute the marriage certificate verifying their continuing, unqualified intent to marry.

guide to the breadth of the majority's ruling." *Jones*, 293 Va. at 57 n.26, 795 S.E.2d at 721 n.26 (quoting *Lee v. Kemna*, 534 U.S. 362, 386 (2002)).  The dissent, for example, claims that "the majority's theory would allow a marriage to be solemnized based solely on the fact that the celebrants had previously consented to be married." *Post* at 29-30.  We disagree.  The Levick-MacDougall marriage began after the ceremony, after the issuance of the marriage license, and after they reasserted their mutual, unconditional, unqualified, present intent to be married by forwarding the marriage register to the rabbi for the purpose of him signing the marriage certificate pursuant to their agreement.  Only after all of these events did the marriage legally begin.[16]

Even further afield is the speculation over the validity of underage marriages, *post* at 35-36, "indefinite secret period[s] during which an apparent marriage is in legal limbo," *post* at 36,

---

[16] The dissent states that the rabbi "admitted that he did not solemnize the marriage" after the initial wedding ceremony.  *Post* at 33.  This is an overstatement.  The only admission by the rabbi was in response to a compound question from Levick's counsel asking whether the parties, since December 21, 2002, had ever "exchanged vows of marriage or otherwise solemnized [their] marriage in your presence."  3 J.A. at 1040.  The rabbi then answered:  "No.  We didn't repeat any part of the *ceremony*.  So we did the ceremony just on December 21st and I filled out the paperwork as soon as I received it on January 21st.  There is no repetition of the *ceremony*." *Id.* at 1040-41 (emphases added).  The rabbi's only admission was merely that no second, in-person ceremony occurred, not that solemnization did not occur after the ceremony.  *See supra* at 2, 13-14.

The dissent asserts that our logic "seems to be circular" because we believe, under the narrow facts of this case, that "the solemnization of the marriage allows the certificate to be executed while, at the same time, the execution of the certificate solemnizes the marriage." *Post* at 32.  We see these two events differently.  Solemnization by the celebrants permits the execution of the marriage certificate by the officiant.  The officiant's execution of the marriage certificate is not the celebrants' act of solemnization.  It is instead, under the unique facts of this case, the officiant's acknowledgement and verification of the celebrants' contemporaneous expression of their mutual intent to marry in order to complete solemnization.  The dissent interprets our reasoning to "convey the idea that . . . the parties 'self-solemnized' their marriage" because the solemnization was done in the "absence of the officiant." *Post* at 32.  We fail to see how that could be so based on the agreement between the parties and the officiant to solemnize the marriage in this manner.

14

limitation periods for annulment proceedings, *post* at 36, and "young lovers" who immediately betray each other, *post* at 37-38. This "parade of horribles," *see, e.g.*, *Bristol-Myers Squibb Co. v. Superior Court*, ___ U.S. ___, ___, 137 S. Ct. 1773, 1783 (2017), involves factual circumstances wholly dissimilar from the case that we now decide. Though we need not, and should not, offer advisory opinions on such hypotheticals, we can disclaim with confidence the dissent's effort to predict them. As we recently emphasized, "all statements of law" in our judicial opinions "are to be read in connection with the facts of the case to which they are to be applied." *Funny Guy, LLC v. Lecego, LLC*, 293 Va. 135, 160, 795 S.E.2d 887, 900 (2017) (quoting *Ellerson Floral Co. v. Chesapeake & Ohio R.R.*, 149 Va. 809, 812, 141 S.E. 834, 835 (1928)).

## C.

We also acknowledge, but find unpersuasive, the dissent's hardship argument. "Clearly," the dissent asserts, under our holding "there is the definite possibility that other celebrants will similarly end up believing they were married on one date, when in fact, their official wedding date is entirely different," and "the lack of transparency created by the majority's theory can and will create innumerable problems in the future." *Post* at 37.

The dissent's remedy for these unspecified "innumerable problems," *post* at 37, however, would be to compound them — as this case so poignantly illustrates. Levick and MacDougall believed that they were legally married from 2003 to 2013, the period of time before Levick first came up with his argument to challenge the validity of the marriage during the midst of divorce litigation. MacDougall still believes that she is married today. The dissent's reasoning, however, sets aside over 10 years of their marriage by declaring it void ab initio. A legal transaction deemed void ab initio can be challenged by any person, in virtually any proceeding, for any reason precisely because the transaction, in the eyes of the law, does not exist. *See Singh*

15

*v. Mooney*, 261 Va. 48, 52, 541 S.E.2d 549, 551 (2001); *Toler v. Oakwood Smokeless Coal Corp.*, 173 Va. 425, 432, 4 S.E.2d 364, 367 (1939). No Virginia court has ever applied such a potent remedy to a legal challenge to marriage like the one asserted in this case.

In taking the void-ab-initio path, the dissent overlooks the significant hardships its reasoning would cause. Creditors of one spouse could seek to strip a couple of the protection of a tenancy by the entirety through a challenge to the validity of the marriage, even when the couple is happily married and wants to remain so. *See, e.g.*, *Baker v. Speaks*, 334 P.3d 1215, 1221-24 (Wyo. 2014). Every legal benefit afforded to lawfully married couples — such as joint-filing status for federal and state income tax filings; rights under wills, trusts, and other estate-planning instruments; beneficiary status in retirement and insurance policies; and a variety of similar benefits that presuppose the existence of a lawful marriage — could be retroactively challenged and expose both parties to the allegedly invalid marriage to a host of unforeseeable financial consequences. *See generally* 1 Homer H. Clark, Jr., The Law of Domestic Relations in the United States § 3.6, at 246-56 (2d ed. 1987) (discussing the "bewildering variety of situations" arising from the potential retroactive effects of void marriages on certain rights and obligations that turn upon the existence of a valid marriage).

The dissent's void-ab-initio theory would be particularly harsh to MacDougall. After the parties married, she left a successful career to become an uncompensated chief operating officer for Levick's business and, during the course of her marriage, made $380,000 in personal loans to the business.[17] These purely financial circumstances served as the principal reasons for the

_____

[17] Although each of the parties testified that this amount was eventually repaid to MacDougall a couple of years later, *see* 2 J.A. at 709, 812, the loans were made to Levick's business during a period of financial difficulty in which the business did not have a line of credit established and could not cover payroll checks, *see id.* at 810-12; 5 *id.* at 2140. At the time of MacDougall's contribution, therefore, it was accompanied by a realistic possibility that it might not be repaid.

16

monetary and property-distribution provisions in the marital agreement. The dissent's view, however, would treat her multi-year investment over the course of her marriage as irrelevant. She could not enforce the marital agreement, in which Levick agreed to pay her $150,000 in spousal support annually, pay for her health insurance premiums, divide equally the proceeds from the sale of the marital home, and, in the event that Levick sold his company, provide her with 35% of the proceeds. Nor would she, for that matter, have any other right to seek spousal support or to request a fair apportionment of marital property because, under the dissent's view, she never was Levick's spouse and never had any marital property.

### D.

Finally, we disagree with the dissent's conclusion that the subtle complexities of this case boil down to the failure of the rabbi to follow up with the celebrants after receiving the marriage register in the mail. The dissent contends the rabbi should have "verified the parties' mutual present consent to be married at a time when they had a marriage license." *Post* at 33. The dissent acknowledges that, if the rabbi had "take[n] such action" to confirm that "the parties still mutually and presently consented to be married," then the dissent "would agree there had been a solemnization of the marriage after the license had been issued," *post* at 33, and thus, the marriage would be perfectly legal. The dissent does not identify the specific type of "action" that would satisfy this required verification by the rabbi, *post* at 33, but the dissent concedes later in the opinion that "contact with them via telephone" would be sufficient "to verify the celebrants' mutual present consent to be married," which was "not the case here," *post* at 34 (citing 1987-1988 Op. Atty. Gen. 316; 1959-1960 Op. Atty. Gen. 219).

This concession serves as an appropriate coda to our analysis. By forwarding the marriage register to the rabbi as they previously agreed to do, both Levick and MacDougall were by that act alone reasserting that "the parties still mutually and presently consented to be

17

married." *Post* at 33. The rabbi executed the marriage certificate in reliance on this intent. Neither Levick, MacDougall, nor the rabbi have ever suggested that the parties had a contrary intent. The dissent characterizes the rabbi's verification of the parties' intent as a mere "assumption" that this Court can and should judicially disregard. *Post* at 33-34. We fail to see why we should do so. The rabbi made an assumption, to be sure. But it was the very assumption that the celebrants agreed with the rabbi at the ceremony that he should make and, indeed, asked him to make. Neither Levick nor MacDougall have ever argued that the rabbi should not have made such an assumption. We know of no authority requiring us to declare this marriage void simply because the rabbi failed to make a follow-up call or to take some other action to verify the parties' mutual intent to marry and instead relied upon the parties' agreed-upon manner of verification.

IV.

Having stated what we do decide, we must clarify what we do not decide. Following the traditional doctrine of judicial restraint, we "decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. White*, 293 Va. 411, 419, 799 S.E.2d 494, 498 (2017) (citation omitted).[18] The best ground for decision in this case is also the narrowest: Nothing in the governing statutes or our case law renders a marriage void ab initio or voidable merely because the officiant and celebrants agree in advance to solemnize the marriage in the unusual manner that occurred in this case. We thus do not address dissimilar situations such as, for example, those in which the officiant and celebrants make no such solemnization agreement during a

---

[18] *See also Board of Supervisors of Loudoun Cty. v. State Corp. Comm'n*, 292 Va. 444, 453 n.8, 790 S.E.2d 460, 464 n.8 (2016); *Hampton Rds. Bankshares, Inc. v. Harvard*, 291 Va. 42, 52, 781 S.E.2d 172, 177 (2016); *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 312 n.6, 777 S.E.2d 848, 851 n.6 (2015); *Commonwealth v. Swann*, 290 Va. 194, 196, 776 S.E.2d 265, 267 (2015); *Alexandria Redev. & Hous. Auth. v. Walker*, 290 Va. 150, 156, 772 S.E.2d 297, 300 (2015).

wedding ceremony, situations where either celebrant fails to join unequivocally in the agreed-upon reaffirmation of their solemn and mutual intent to marry, or, for that matter, situations where either celebrant outright disputes that he or she ever made such an agreement or reaffirmation. Nor are we faced with a scenario involving a marriage certificate backdated to a date prior to the issuance of the license.

Our holding also renders moot a myriad of debates in this case on various other subjects, including:

- whether Code § 20-13, if violated under this sequence of events, provides a mandatory, as opposed to a mere directory, statutory requirement;[19]

- whether a violation of Code § 20-13, if proven, could be cured by Code § 20-31;[20]

- whether an allegedly completed marriage, if found to be invalid and incurable, would be declared void ab initio, as the circuit court held, or merely voidable, as the Court of Appeals held;[21]

---

[19] *Compare Offield*, 100 Va. at 263, 40 S.E. at 914, *with* 1 Bishop, *supra*, § 449, at 192, *id.* § 403, at 172, 2 Schouler & Blakemore, *supra*, § 1191, at 1446, *and id.* § 1217, at 1461. *See generally* Arthur Warren Phelps, Domestic Relations in Virginia § 4-3, at 20 (3d ed. 1977).

[20] Levick argues that the literal terms of Code § 20-31 do not cover the defect that he alleges in this case. *See* Appellee's Br. at 25-27. MacDougall counters that remedial statutes are not intended to be exhaustive. *See* Appellant's Br. at 19; *see, e.g.*, *Hudson v. Commonwealth*, 267 Va. 36, 41, 591 S.E.2d 679, 682 (2004). *See generally* Phelps, *supra* note 19, § 4-3, at 20.

[21] *Compare post* at 42-44, *with MacDougall*, 66 Va. App. at 70-74, 782 S.E.2d at 192-94 (citing *Barrons v. United States*, 191 F.2d 92, 98-99 (9th Cir. 1951); *Hames v. Hames*, 316 A.2d 379, 385 (Conn. 1972); *Dodrill v. Dodrill*, Nos. 03CA578 & 580, 2004 Ohio App. LEXIS 1977, at *9-11 (Ohio Ct. App. Apr. 28, 2004)). *See also Haggin*, 53 N.W. at 211; *Holder v. State*, 29 S.W. 793, 793 (Tex. Crim. App. 1895).

*See generally Payne v. Commonwealth*, 201 Va. 209, 211, 110 S.E.2d 252, 254 (1959) (refusing to extend the void-ab-initio concept to underage marriages because "there is no statutory provision declaring that marriages involving persons under the age of consent are either void or voidable, and there are no Virginia cases so holding"). That observation in *Payne*, standing alone, was enough to convince us that "the [underage] marriage of the parties was voidable only and not void. The parties are husband and wife unless and until the marriage is annulled." *Id.* (footnote and citations omitted).

19

- whether a party in Levick's position would be precluded by the doctrines of equitable estoppel or laches from challenging the validity of his marriage;[22] and

- whether the marital agreement should be enforced despite a mistaken assumption by the parties at the time of executing it that their marriage was lawful.[23]

Our silence on these underlying questions of law leaves them open for future debate and, thus, allows them to be addressed in later cases in which they are ripe for decision.

V.

In sum, Levick has failed to rebut the strong presumption favoring the validity of his marriage to MacDougall. The Court of Appeals was correct in reversing the circuit court's holding that the marriage was void ab initio but was incorrect in concluding that the marriage was voidable upon the challenge of either party. We thus reverse and remand the case to the

---

[22] *See, e.g.*, *Yun v. Yun*, 908 S.W.2d 787, 790-91 (Mo. Ct. App. 1995); *Johnson v. Johnson*, 41 Tenn. (1 Cold.) 626, 633-34 (1860); *cf. Fox v. Fox*, 444 S.W.2d 865, 869-71 (Ark. 1969); *Spellens v. Spellens*, 317 P.2d 613, 615, 619 (Cal. 1957); *In re Marriage of Recknor*, 187 Cal. Rptr. 887, 892-93 (Cal. Ct. App. 1982); *Heuer v. Heuer*, 704 A.2d 913, 920-21 (N.J. 1998). We have not directly addressed the application of equitable defenses in a context similar to this case, but we have applied equitable estoppel and laches concepts in other areas of Virginia family law. *See, e.g.*, *McNeir v. McNeir*, 178 Va. 285, 291, 16 S.E.2d 632, 633-34 (1941); *Dry v. Rice*, 147 Va. 331, 339-40, 137 S.E. 473, 475-76 (1927).

[23] *Compare Burton v. Haden*, 108 Va. 51, 56-58, 60 S.E. 736, 738 (1908) (recognizing the antecedent-right exception to the general rule that prohibits rescission based upon mistakes of law), *with Piedmont Tr. Bank v. Aetna Cas. & Sur. Co.*, 210 Va. 396, 401-02, 171 S.E.2d 264, 268 (1969) (emphasizing that *Burton* "involved unusual equitable circumstances" and thereby placed the contest "outside of the general rule because there was a mistake of a private legal interest rather than a mistake as to a general rule of law"). Furthermore, we need not address the family-agreement exception to the antecedent-right exception. *See Weade v. Weade*, 153 Va. 540, 548, 150 S.E. 238, 240 (1929) (recognizing the disjunctive principle "that a family agreement entered into on the supposition of a right, or of a doubtful right, although it afterwards turns out that the right was on the other side, is binding, and the right cannot prevail against the agreement of the parties" (citation omitted)). *See generally* John Adams, Jr., The Doctrine of Equity 189 (1850); Edmund H.T. Snell, The Principles of Equity 509 (Archibald Brown ed., 12th ed. 1898); 1 Joseph Story, Commentaries on Equity Jurisprudence § 129, at 148-49 (6th ed. 1853).

Court of Appeals with instructions to remand the case to circuit court for further proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE POWELL, with whom JUSTICE GOODWYN and JUSTICE MIMS join, dissenting.

Prior to today, the requirements for a valid marriage in the Commonwealth of Virginia were clear and straightforward. The General Assembly requires that a marriage be conducted under a license and solemnized. Code § 20-13. Solemnization must occur after a marriage license is obtained for the marriage. *Id.*; Code § 20-14.1. According to the majority, however, the strong presumption in favor of marriage allows celebrants to disregard these statutory requirements. As such, celebrants lacking a marriage license may now enter into a "solemnization agreement" that delays the effect of their nuptials until they acquire the legally-required license, at which point the execution of the marriage certificate, without more, produces a valid marriage.

I acknowledge the strong presumption in favor of marriage and respect the majority's attempt to honor that judicially-created presumption. However, first and foremost, we must uphold the statutes passed by the General Assembly. A desire to uphold a "robust presumption" cannot overcome our obligation to adhere to the clear language of marriage statutes passed by our legislature. As we have long recognized,

> the duty of this court is not to make law, but to construe it; not to wrest its letter from its plain meaning in order to conform to what is conceived to be its spirit, in order to subserve and promote some principle of justice and equality which it is claimed the letter of the law has violated.

*Saville v. Virginia Ry. & Power Co.*, 114 Va. 444, 452-53, 76 S.E. 954, 957 (1913).

21

Furthermore, I find no evidence that the majority's theory has ever been adopted by any other court in this country. Indeed, there is no precedent for sanctioning a solemnization agreement that requires a marriage be held in limbo until it is validated by the acquisition of a marriage license at some undetermined point in the future. Such an approach appears to be directly at odds with the leading authority on the subject of marriage, which this Court has turned to on numerous occasions.[1] "The rule is, that, as marriage cannot be in abeyance, if the thing stipulated for is meant by the parties to delay the nuptials, however briefly, there is no marriage." 1 Joel Prentiss Bishop, New Commentaries on Marriage, Divorce, and Separation § 347, at 144 (1891).

In determining whether the marriage in the present case was solemnized, the majority focuses on the parties' subjective intent, as evidenced by the parties' alleged "solemnization agreement." Our marital statutes are not concerned with the subjective agreements individuals make in an attempt to solemnize a marriage; our marital statutes are objective in nature, looking to whether there was, in fact, an act of solemnization that occurred after a license was obtained, as required by statute. Here, there was no such objective act of solemnization. It is undisputed that the religious ceremony certified in the marriage certificate to have taken place on January 21, 2003 did not occur on that date. Indeed, the majority cannot point to any evidence that demonstrates that the parties' marriage was solemnized by an officiant after the marriage license was obtained on January 6, 2003.

The majority is generous in referring to the parties' actions as a "solemnization agreement." In reality, the parties merely decided to go forth with a wedding without the license

---

[1] As the Court of Appeals observed, there are at least 22 prior occasions where we "cite Bishop's treatise as authoritative." *MacDougall*, 66 Va. App. at 71 n.7, 782 S.E.2d at 192 n.7.

required under Virginia law because the officiant agreed to sign the license whenever the parties got around to mailing one to him.  Thus, what the majority calls a "solemnization agreement" was essentially a decision by the parties to circumvent the clear requirements of our marital statutes.

Moreover, rather than harmonizing the relevant marriage statutes, the majority's theory discordantly approves a privately designed solemnization agreement that admittedly violated numerous marriage statutes and resulted in the filing of a marriage certificate which contains demonstrably incorrect information.[2]  As no judicially-created theory can validate a marriage that does not satisfy the requirements mandated by the General Assembly, I respectfully dissent.

## I.

The majority's decision is premised upon the strong presumption of marriage based on matrimonial cohabitation.  *Eldred v. Eldred*, 97 Va. 606, 625, 34 S.E. 477, 484 (1899) ("The presumption of marriage from cohabitation apparently matrimonial is one of the strongest presumptions known to the law.").  I do not dispute the existence of this presumption, nor do I question that it serves a laudable purpose.  However, given the mandatory nature of our marital statutes, any determination as to the existence of a valid marriage begins and ends, not with a presumption, but with an analysis of whether the plain language of our marital statutes has been followed.  The majority insists that such an approach is too simple, as it leaves several

---

[2] Specifically, the marriage certificate indicates that the marriage was solemnized by a religious ceremony that took place in McLean, Virginia on January 21, 2003.  The record, however, demonstrates that neither Levick nor the rabbi were in McLean, Virginia on January 21, 2003.  Additionally, the rabbi testified that no ceremony, religious or otherwise took place on January 21, 2003.  A copy of the relevant marriage license and marriage certificate are attached for reference.

unanswered questions.[3]  "In the law, as in life, the simplest explanation is sometimes the best one."  *Loan Syndications & Trading Ass'n v. SEC*, 818 F.3d 716, 718 (D.C. Cir. 2016).  Such an approach seems particularly apropos here, given that we have long recognized that "[o]ur marital laws are plain and simple, not difficult to understand by the humblest citizen."  *Eldred*, 97 Va. at 629, 34 S.E. at 485.  Thus, while it is true that "[t]he public policy of Virginia . . . has been to uphold the validity of the marriage status as for the best interest of society, except where marriage is prohibited between certain persons," *Needam v. Needam*, 183 Va. 681,686, 33 S.E.2d 288, 290 (1945), such public policy concerns cannot override the undisputed evidence that the parties in the present case failed to meet the statutory requirements necessary to create a valid marriage.

Marriage "has always been subject to the control of the legislature."  *Maynard v. Hill*, 125 U.S. 190, 205 (1888).  Indeed, as this Court observed long ago:

> Marriage is a contract *sui generis*, and differing in some respects from all other contracts; so that the rules of law which are applicable in expounding and enforcing other contracts may not apply to this.  The contract of marriage is the most important of all human transactions; it is the very basis of the whole fabric of civilized society.  The status of marriage is *juris gentium*, and the foundation of it, like that of all other contracts, rests on the consent of the parties; but it differs from other contracts in this, that the rights, obligations or duties arising from it are not left entirely to be regulated by the agreement of the parties, but are to a certain extent matters of municipal regulation over which the parties have no control by any declaration of their will.

---

[3] As I explain below, the "conceptually complex yet necessary legal questions" which appear to vex the majority are easily answered by following the plain language of the marriage statutes passed by the General Assembly.  *Ante* at 5.  There are no essential attributes of solemnization.  It does not necessarily end at the last moment of a marriage ceremony.  Solemnization and ceremony are not exact synonyms.  A ceremony is simply evidence of a solemnization.  As discussed below, a solemnization occurs when the celebrants demonstrate to an officiant that they mutually and presently consent to be married.

*Herring v. Wickham*, 70 Va. (29 Gratt.) 628, 635 (1878) (citation and internal quotation marks omitted).

In Virginia, any marriage entered into must, at a minimum, satisfy the statutory requirements established by the legislature. Moreover, adherence to the requirements of our marital statutes is mandatory, such that "no marriage or attempted marriage, if it took place in this State, can be held valid here, unless it has been shown to have been under a license, and solemnized according to our statutes." *Offield v. Davis*, 100 Va. 250, 263, 40 S.E. 910, 914 (1902). As a result, our marital statutes "require strict compliance" and, therefore, "Virginia does *not* follow the majority view found in most states, that marriage requirements are directory and require only substantial compliance to constitute a valid marriage." Peter N. Swisher, Lawrence D. Diehl, & James R. Cottrell, *Family Law: Theory, Practice, and Forms* § 1:2 at 8 (2017 ed.). (emphasis in original).[4]

The Court explained its rationale for requiring such strict compliance, stating:

> "It is true the Legislature may expressly provide that all marriages
> not entered into in the ways pointed out by the statute, and not
> within the exceptions provided for, should be held invalid, but this
> affords no reason for not giving effect to the clear intention
> otherwise expressed in the legislation existing, because the
> Legislature has not declared all others void. Our statutes in
> relation hereto would, if upon any other subject, be held mandatory
> and prohibitive, and we see no reason why the same effect should
> not be given here, for the law could as well say that all attempted
> marriages should be valid, notwithstanding the statutory requisites
> were not complied with. However this question is decided, it may

---

[4] Although Virginia may not follow the majority view on this issue, we are far from the only state that requires mandatory compliance with our marital statutes in order to form a valid marriage. *See, e.g.*, *Pinkhasov v. Petocz*, 331 S.W.3d 285 (Ky. 2011); *Roe v. Ludtke Trucking*, 732 P.2d 1021, 1023 (Wash. Ct. App. 1987) ("In Washington, a marriage can be created only by compliance with the statutory provisions."); *Kisla v. Kisla*, 19 S.E.2d 609, 610-11 (W. Va. 1942) (holding that West Virginia's marital statute is mandatory in its requirement that marriages must be solemnized under a license).

result in hardship in some cases, but we think the lesser injury will come from an adherence to the statutory requisites than otherwise."

*Offield*, 100 Va. at 261, 40 S.E. at 914 (quoting *In re Estate of McLaughlin*, 30 P. 651, 658-59 (Wash. 1892)).

Code § 20-13 states that "[e]very marriage in this Commonwealth shall be under a license and solemnized in the manner herein provided." The plain language of the statute establishes that a valid marriage has two requirements: a license and a solemnization.

Code § 20-14 provides that every license for a marriage shall be issued by the clerk or deputy clerk of a circuit court. Code § 20-14.1 states:

> *Every marriage license issued under § 20-14 shall constitute authority for a period of only sixty days from the date of issuance for the solemnization of a marriage of the licensees.* Whenever such sixty-day period shall have elapsed without the solemnization of a marriage of the licensees, the license shall expire.

(Emphasis added.)

By its plain language, Code § 20-14.1 establishes that a marriage license grants an officiant the authority to solemnize a marriage "for a period of only sixty days *from the date of issuance*." (Emphasis added.) As the marriage license grants an officiant the authority to solemnize a marriage, it necessarily must be issued before the solemnization can take place.[5] Indeed, logic dictates that the authorization to perform an act must precede the act itself. This Court has explicitly recognized this point, stating that a license "confer[s] a right to do something which otherwise one would not have the right to do; it is a prerequisite to the right to . . . do certain acts." *Commonwealth v. Shell Oil Co.*, 210 Va. 163, 166, 169 S.E.2d 434, 437 (1969).

---

[5] The marriage license issued in the present case explicitly stated that any person licensed to perform marriage in Virginia was "hereby authorized to join the above named persons [i.e., Levick and MacDougall] in marriage under procedures outlined in the statutes of the Commonwealth of Virginia."

26

As the Court of Appeals correctly analogized, if "one cannot [legally] drive, hunt, or practice law or medicine before acquiring the necessary license," then "[b]y that same token, one cannot [legally] marry before acquiring a marriage license." *MacDougall*, 66 Va. App. at 64, 782 S.E.2d at 189.[6] *See also* 2009 Op. Atty. Gen. 50 (opining that a court may not affirm marriages that were performed in the absence of a marriage license or order the retrospective issuance of a marriage license).

Any question as to the intent of the legislature regarding whether a marriage can be solemnized prior to the issuance of a marriage license is answered by the General Assembly's passage of what is now Code § 20-28. Since 1919, the General Assembly has made the act of solemnizing a marriage without a lawful license a criminal offense. Code § 20-28.[7] The Court of Appeals correctly stated the obvious: "By attaching a criminal penalty to the performance of a

---

[6] Along these same lines, the acquisition of the necessary license does not operate to retroactively legitimize the actions taken prior to such acquisition. Thus, any ceremony that occurred prior to the date that the license was acquired cannot serve as a valid basis for meeting the solemnization requirement under Code § 20-13.

[7] Code § 20-28 states:

> If any person knowingly perform the ceremony of marriage without lawful license, or officiate in celebrating the rites of marriage without being authorized by law to do so, he shall be confined in jail not exceeding one year, and fined not exceeding $500.

By its plain language, Code § 20-28 criminalizes two separate and distinct acts: solemnizing an unlicensed marriage and officiating a wedding without first qualifying as an officiant. *Cf. Cramer v. Commonwealth*, 214 Va. 561, 565, 202 S.E.2d 911, 914 (1974) (per curiam) (recognizing that the legislature has an interest in ensuring that a marriage be memorialized by an individual meeting certain qualifications). Although the General Assembly has enacted legislation explicitly validating marriages solemnized under a license by an unqualified officiant, *see* Code § 20-31, it has taken no such action with regard to marriages solemnized without a license. Given our strict adherence to marital statutes, we must interpret the General Assembly's silence on this issue to mean that it did not intend for marriages solemnized without a license to be considered valid.

ceremony of marriage without a license, the General Assembly clarified its intention that a lawful marriage [requires] solemnization *after* a license has been obtained." *MacDougall*, 66 Va. App. at 65, 782 S.E.2d at 189 (citing *Offield*, 100 Va. at 254, 40 S.E. at 911) (emphasis added). Thus, when Code § 20-13 is read in context with the remainder of Article 20, it leads to only one logical conclusion: a marriage license must be issued *before* the solemnization can occur.[8]

Turning to the solemnization requirement, I agree with the majority that neither this Court nor the General Assembly have defined the term "solemnization." In determining the meaning of the term, as used in Code § 20-13, "[i]t is our duty to take the words which the legislature has seen fit to employ and give to them their usual and ordinary signification." *Saville*, 114 Va. at 453, 76 S.E. at 957. "Solemnization" is defined as "an act of solemnizing or the condition of being solemnized." Webster's Third New International Dictionary 2168 (1993).[9] "Solemnize," in turn, means "to hold, conduct, observe, or honor with due formal ceremony or solemn notice" and "to perform with pomp or ceremony or according to legal forms." *Id.* Similarly, Black's Law Dictionary defines "solemnize" as meaning "[t]o enter into (a marriage, contract, etc.) by a formal act, [usually] before witnesses." Black's Law Dictionary 1607 (10th ed. 2014).[10]

_____

[8] The majority does not appear to dispute this fact. Rather, it takes the position that the acquisition of the license may be part of the solemnization, which need only conclude after the license has been acquired. For reasons stated below, I cannot agree.

[9] Black Law Dictionary defines "solemnization" as "[t]he performance of a formal ceremony (such as a marriage ceremony) before witnesses, as distinguished from a clandestine ceremony." Black's Law Dictionary 1607 (10th ed. 2014). Virginia has no requirement that a marriage involve a formal ceremony or occur before witnesses, but it does require a solemnization event which must be performed by an officiant. *See, e.g.*, Code § 32.1-267.

[10] It is telling that the majority fails to offer any definition of "solemnization" or "solemnize."

28

As correctly noted by the majority, the Commonwealth has no interest in the particular ceremony or ritual that is performed to solemnize a marriage, so long as a solemnization occurs. *See Cramer v. Commonwealth*, 214 Va. 561, 565, 202 S.E.2d 911, 914 (1974) (per curiam) ("The state has no official interest in the place where a marriage occurs, or in the ceremony or ritual which surrounds the act."); *Alexander v. Kuykendall*, 192 Va. 8, 11, 63 S.E.2d 746, 748 (1951) ("[N]o particular form of marriage ceremony is required by civil law."). Thus, while a marriage ceremony is probably the most common manner in which a marriage is solemnized, it is not the only manner of doing so.

The import of the solemnization requirement is not in *how* it is accomplished; it is in *what* it accomplishes. The most important aspect of the solemnization requirement is its underlying purpose: to ensure that both celebrants presently consent to be married. A proper solemnization requires that the celebrants represent to the officiant their mutual, sincere present consent to be married. "No form of solemnizing words being necessary, it is sufficient for the proper person, as a minister or justice of the peace, to be present, and take cognizance of the mutual engagement of the parties to assume the marital relation." 1 Bishop, *supra*, § 439, at 189.

My disagreement with the majority stems from the fact that the majority's solemnization agreement theory undermines the entire purpose of the solemnization requirement because it does not require verification of the celebrants' *present* consent to be married. Indeed, the receipt of a marriage register in the mail, without more, tells an officiant nothing about celebrants' present state of mind. The majority's theory would allow a marriage to be solemnized based

solely on the fact that the celebrants had previously consented to be married.[11] Clearly this is incorrect.

"As, in the nature of the marriage status, it cannot be in abeyance, the consent must be to *present* marriage, not depending on a future condition, or to be for an instant postponed." 1 Bishop, *supra*, § 238, at 103 (emphasis added). Indeed,

> The entire doctrine relating to this subject is, that, to render competent parties husband and wife, they must . . . mutually agree *in the present tense to be such*, - no time being contemplated to elapse before the assumption of the status.

*Id.* § 299, at 124 (emphasis added).

To be clear, it is not my position that every wedding ceremony that precedes the acquisition of a license results in a void marriage. Far from it. My understanding of the law is that a solemnization occurs when the celebrants presently demonstrate to an officiant their mutual consent to be married. As long as this consent to be married is presently expressed to and, at the same time, received by the officiant when the celebrants possess a marriage license, a valid marriage is created.[12] Stated another way, there must be a nexus where the celebrants possess the marriage license (i.e., the license requirement) and the officiant is able to verify their

---

[11] It is unclear where the majority's disagreement with this statement lies. According to the majority, on January 6, 2003, the parties "reasserted their mutual, unconditional, unqualified, *present intent* to be married by forwarding the marriage register to the rabbi for the purpose of him signing the marriage certificate pursuant to their agreement." *Ante* at 14. Thus, when the rabbi received the marriage register on January 21, 2003, he only became aware of the parties' intent to be married on the date that the parties sent it: January 6, 2003. In other words, on January 21, 2003, the rabbi could only verify and authenticate their *past* intent to be married, not their *present* intent.

[12] The majority claims that "[t]his is what happened in this case," yet the evidence unequivocally demonstrates that this is most certainly not what happened in this case. *Ante* at 12. Here, the rabbi did not receive the parties' present expression of intent *at the same time* that the parties expressed it; he received it 15 days later.

mutual *present* consent to be married (i.e., the solemnization requirement). This, in my opinion, is what Code § 20-13 requires.[13]

No such nexus existed in this case. The record demonstrates that the rabbi had no contact with the parties between December 21, 2002, when he conducted the wedding ceremony and January 21, 2003, when he executed the wedding certificate. Therefore, it cannot be said that he knew whether the parties mutually and presently consented to be married at any point after they obtained the marriage license, including on the date that he executed the marriage certificate.[14]

It is telling that, according to the majority, the solemnization is complete and the marriage legally began on the date of the execution of the marriage certificate. *Ante* at 6. However, the execution of the marriage certificate is not part of the solemnization; rather, the execution of the marriage certificate is the means through which an officiant certifies that the marriage has been solemnized. *See* Code § 32.1-267(C) (requiring that the officiant "certify to the facts of the marriage" and file the record with the officer who issued the marriage license); *Davidson*, 2009 Va. App. LEXIS 313, at *4-5 (holding that the execution of the marriage certificate "presupposes a 'marriage ceremony' solemnizing the union"). Indeed, Code § 32.1-267(C) clearly establishes that the execution of the marriage certificate does not mark the

---

[13] Such an approach is not novel. The Court of Appeals has recognized this concept since at least 2009, when it held that "whatever formalities the [solemnization] requires, at the very least it requires the attendance of both the prospective bride and groom." *Davidson v. Davidson*, No. 2356-08-3, 2009 Va. App. LEXIS 313, at *5 (July 14, 2009) (unpublished). There can be little doubt that the Court of Appeals' holding is premised on the notion that the attendance of both the bride and groom is required to express their present consent to be married.

[14] Given that both parties must be present to apply for a marriage license, the most that the rabbi could have inferred from receiving the marriage license in the mail was that the parties mutual consent to be married existed on January 6, 2003, the date they acquired the wedding license. Again, this amounts to evidence of the parties' past consent to be married; it cannot, under any definition of the term, be considered evidence of the parties' present consent to be married.

31

beginning of the marriage, as the marriage certificate may be executed up to five days *after* the ceremony solemnizing the marriage.[15]  In relying on the perfunctory act of executing the certificate as part of the solemnization of the marriage, the majority's logic seems to be circular: the solemnization of the marriage allows the certificate to be executed while, at the same time, the execution of the certificate solemnizes the marriage.  *Ante* at 14.

In its attempt to rebut my observation that its logic is circular, the majority succeeds in further muddying the waters.  The majority responds by stating that "[s]olemnization by the *celebrants* permits the execution of the marriage certificate by the officiant" and the rabbi's "execution of the marriage certificate is *not* the celebrants' act of solemnization."  *Ante* at 14 n.16 (emphasis added).  While both of these statements are accurate standing alone, they present an incomplete picture of what is necessary for a solemnization.  Indeed, these statements could be read to convey the idea that, by obtaining a marriage license and forwarding it to the rabbi, the parties "self-solemnized" their marriage.

A marriage, however, cannot be self-solemnized.  A self-solemnization necessarily occurs in the absence of an officiant.  Obviously an officiant who was absent from the solemnization could not witness the celebrants' *present*, mutual consent to be married.  At best, the officiant could only learn of the celebrants' expression of consent at some later time, i.e., their past consent to be married.  Our marital statutes require that an officiant take cognizance of the celebrants' present mutual consent to be married.  Accordingly, a self-solemnization is insufficient to solemnize a marriage.

---

[15] The fact that Code § 32.1-267(C) provides for the incapacitation or death of the officiant after the solemnization is complete but before the marriage certificate is executed similarly establishes that the execution of the marriage certificate is ministerial and not, as the majority insists, the final step in the solemnization.

Along these same lines, I find it dispositive that, when asked whether the parties had, after December 21, 2002, "exchanged vows of marriage or otherwise solemnized [their] marriage in [his] presence," the rabbi responded:

> No. We didn't repeat any part of the ceremony. So we did the ceremony just on December 21st and I filled out the paperwork as soon as I received it on January 21st. There is no repetition of ceremony.

He further explained that, when he received the wedding certificate in the mail, he executed it because he "*assumed* they hadn't changed their minds." (Emphasis added.) In other words, the rabbi admitted that he did not solemnize the marriage after December 21, 2003; he just signed the "paperwork" based on an assumption.

Had the rabbi confirmed on January 21, 2003 that the parties still mutually and presently consented to be married, then I would agree there had been a solemnization of the marriage after the license had been issued. The required nexus would exist as the rabbi would have verified the parties' mutual present consent to be married at a time when they had a marriage license. However, the rabbi failed to take such action. As a result, we are left with a marriage that was not solemnized by an officiant.

This assumption demonstrates another flaw in the majority opinion, one that it never directly addresses: there is no evidence that the rabbi knew that the parties mutually and presently consented to be married on the day he signed the marriage certificate. Rather than address this flaw, the majority appears to take the position that the rabbi's failure to verify the parties' mutual present consent can be simply overlooked by equating past consent with present consent. For example, the majority takes the position that, by obtaining the marriage register and sending it to the rabbi, the parties "repeated and reaffirmed to the [rabbi] their joint, unqualified intent to marry." *Ante* at 13. Assuming this is true, then, at best, this merely indicates that, on

33

January 6, 2003, the parties repeated and reaffirmed their intent to be married *outside of the presence of the rabbi*. It is undisputed that the rabbi did not receive the marriage register until 15 days later. Thus, on January 21, 2003, when the rabbi received the marriage register, he had evidence of the parties' *past* intent and mutual consent to be married, not their *present* intent and mutual consent to be married. By any interpretation, a 15-day lapse renders the January 6, 2003 expression of the parties' intent a past expression of intent. It is certainly not a "contemporaneous expression" as the majority asserts. *Ante* at 14 n.16. Thus, it cannot be said that the marriage was solemnized by the rabbi after the license was obtained.

The import of the requirement that an officiant be able to verify that the celebrants possess a mutual present consent to be married is at the very heart of the two Attorney General opinions upon which the majority relies. Notably, the facts underlying each Attorney General opinion demonstrate that, although one or both celebrants were not physically present with the officiant at the time of solemnization, the officiant was in contact with them via telephone. *See* 1987-1988 Op. Atty. Gen. 316; 1959-1960 Op. Atty. Gen. 219. Thus, in both scenarios discussed in these opinions, the officiant was able to solemnize the marriage because the officiant was able to verify the celebrants' mutual present consent to be married. Such was not the case here.[16]

I do not dispute that the celebrants and the officiant had an agreement to go forward with the marriage ceremony without a license and that the officiant agreed to sign a marriage license

---

[16] Both of these Attorney General opinions are premised on the fact that, although both celebrants were not in the same physical location as the officiant or each other, they had acquired a marriage license and the officiant was in direct contact with both celebrants when they expressed their present mutual consent to marry. It is this nexus that allows for the creation of a valid marriage. The majority's interpretation of these Attorney General opinions overlooks the fact that the officiant was in direct contact with the celebrants when the marriage was solemnized.

if it was obtained and mailed to him. However, it is inescapable that execution of such a "solemnization agreement" could not be accomplished without violating numerous marital statutes and filing a marriage certificate that contained demonstrably false information. The fact that the private "solemnization agreement" could not be effectuated without violating statutes indicates that such an approach was neither contemplated nor approved by the General Assembly.

Additionally, I cannot overlook the fact that, under the majority's solemnization agreement theory, it is unclear when, exactly, solemnization occurs. Is it December 21, 2002, the day the solemnization agreement was purportedly entered into? Is it January 6, 2003, the day the parties acquired the license and mailed it to the rabbi? Or is it January 21, 2003, the day the solemnization agreement was purportedly concluded? The necessary implication created by the majority's theory is that solemnization is a process. This indicates to me that, under the majority's solemnization agreement theory, there is no specific date of solemnization, as the "solemnization" encompasses the entire time from when the solemnization agreement is entered through its conclusion.

This Court has repeatedly admonished that similar statutes "should be so construed as to harmonize the general tenor or purport of the system and make the scheme consistent in all its parts and uniform in its operation." *Prillaman v. Commonwealth*, 199 Va. 401, 405, 100 S.E.2d 4, 7 (1957). With regard to marriage, a number of statutes indicate that the General Assembly clearly contemplated that the solemnization of a marriage would occur at a specific point in time. Notably, several of our marital statutes specifically reference the time or date of solemnization. For example, Code § 20-45.1(B) provides that marriages are voidable if either of the parties "lacked capacity to consent to the marriage *at the time the marriage was solemnized*." (Emphasis added.) Code § 20-45.1(C) similarly renders a marriage voidable if both of the

35

parties are not either over the age of 18 or emancipated "at the time of the solemnization." *See also* Code § 20-90(B) (permitting "the party who was under the age of 18 *at the time of the solemnization*" to petition to have the marriage affirmed) (emphasis added). The most problematic statute, in my opinion, is Code § 20-89.1(B), which allows for the annulment of a marriage "where the husband, without knowledge of the wife, had fathered a child born to a woman other than the wife within 10 months *after the date of the solemnization of the marriage*." (Emphasis added.) It is thus unclear how, or if, these statutes could function under the majority's nebulous solemnization agreement theory, as there is no specific date of solemnization.

Moreover, as the majority notes, the "'principal objects' of statutes similar to Code §20-13, which require a license and solemnization for a valid marriage, 'are to insure publicity and preserve evidence of marriages.'" *Ante* at 8 (quoting Joseph R. Long, A Treatise on the Law of Domestic Relations § 60, at 99 (2d ed. 1913)). However, these "principal objects" of Code § 20-13 are clearly frustrated by the solemnization agreement theory adopted by the majority. In fact, the majority's theory does just the opposite of insuring publicity and preserving evidence of marriage, because the solemnization agreement approved by the majority allows an indefinite secret period during which an apparent marriage is in legal limbo, known only to the celebrants and the officiant. Furthermore, under a private solemnization agreement, a marriage will only come into being when and if the officiant receives the marriage register and signs the marriage certificate. Thus, the majority's theory transforms the legislature's statutory marriage scheme, which is meant to insure publicity of when the marriage took place, into a scheme in which the actual date of marriage is determined by the efficiency of the postal service and the diligence of

the officiant and ultimately results in the marriage being solemnized outside the presence of the celebrants, at some indeterminate point in time.[17]

Indeed, in the present case, the parties had no idea when they were actually married because they were not required to be present at the time the marriage was solemnized. Clearly, there is the definite possibility that other celebrants will similarly end up believing they were married on one date, when in fact, their official wedding date is entirely different. As the present case demonstrates, the lack of transparency created by the majority's theory can and will create innumerable problems in the future.

The legislature's intent to prevent such a situation is evidenced by Code § 32.1-267(C), which requires a marriage officiant to file a marriage certificate within 5 days of the solemnization ceremony he officiated. Unfortunately, Code § 32.1-267(C) is yet another example of a marriage statute violated by the solemnization agreement theory approved by the majority, as such an approach precludes the need for a solemnization ceremony.

Along these same lines, the majority's theory also has the significant potential for abuse. For example, two young lovers, who only met the day before, express their everlasting love for each other to an officiant and express their desire to be married. The officiant informs them that they need only acquire a marriage license, send it to him, and then they will be married. The next day, after acquiring the marriage license, the couple has their first (and only) fight. They

---

[17] It is further worth noting other, less obvious collateral effects of the majority's holding. This Court has long recognized the important function served by officiants. *See Cramer*, 214 Va. at 565, 202 S.E.2d at 914 (recognizing that the General Assembly entrusted the clergy with the responsibility of solemnizing marriages because marital contracts must be "memorialized in writing and by a person of responsibility and integrity and by one possessed of some educational qualifications."). However, by holding that the mere mailing of a marriage register to an officiant is sufficient to solemnize a marriage, the majority has relegated the role of an officiant from a position of responsibility to a ministerial role. Indeed, what purpose does an officiant serve under the majority's theory, other than to sign paperwork when it is delivered to him or her?

break up and vow to never speak to each other again. Fifteen days later, for whatever reason, one of the former lovers mails the marriage license to the officiant. Upon receiving the marriage license the officiant assumes that nothing in the relationship has changed, as it has been less than a month since the young lovers were before him professing their undying love for each other and their desire to marry. The officiant executes the marriage certificate and sends it back to the court clerk. According to the majority, the former lovers are now married. The majority's criteria have all been met: the former lovers had expressed their intent to marry to the officiant, they followed the officiant's "instructions" regarding the manner in which the wedding would be solemnized by acquiring a marriage license, and the officiant executed that license.[18]

Although the lack of any authority supporting the concept of a solemnization agreement as a substitute for the solemnization of a marriage at a specific point in time should be sufficient grounds to affirm the decision of the lower courts on this matter, I feel it is also important to point out that the facts of the present case do not support the majority's characterization that the parties intentionally entered into such an agreement. According to the rabbi, upon the discovery that the parties did not have a marriage license, he briefly met with the parties and "probably said something to the effect of . . . whenever you go get [a marriage license] and get it to me, I will sign it." Levick testified that the rabbi nonchalantly said: "Let's just carry on with the ceremony, and get it to me later and I'll sign it." Based on his conversation with the rabbi, Levick thought that he and MacDougall were married at the completion of the ceremony and the marriage

---

[18] While it is true that such a marriage could easily be annulled, that presumes the former lovers being aware of their marital status. Notably, the Code does not require that a copy of the marriage certificate be sent to the celebrants. *See* Code § 20-16. Thus, regardless of the ease with which the marriage may be annulled, the fact remains that until that annulment, any subsequent marriage by either of the former lovers would be bigamous and, therefore, void ab initio. *See* Code § 20-43. *See also Toler v. Oakwood Smokeless Coal Corp.*, 173 Va. 425, 435, 4 S.E.2d 364, 368 (1939) ("There is no qualification affecting the absolute nullity, in Virginia, of a bigamous contract.").

license was "just paperwork" or "bureaucratic activity." MacDougall similarly indicated that the rabbi was rather nonchalant about the lack of a license. She testified that, although the rabbi initially told her to "[g]et the license to me just as soon as you can," he subsequently clarified his statement, telling her that "[i]t's not a code blue or whatever. Don't worry about it."

Taken as a whole, the testimony establishes that the parties and the rabbi had a brief discussion about the lack of a marriage license and the process of rectifying that mistake. The parties simply agreed that they needed to get a marriage license and the rabbi needed to sign it at some point in the future, but there was no rush. There is no indication that either the rabbi or the parties had any idea they were still solemnizing the marriage. Indeed, there was absolutely no discussion of solemnization at all. Thus, the record, at best, demonstrates that the parties and the rabbi thought the marriage was complete aside from the ministerial task of acquiring and completing the license. It was, by their own testimony, "just paperwork" and nothing to worry about. Therefore, even applying the majority's flawed solemnization agreement theory to the present case, the decision of the Court of Appeals can be affirmed on the additional ground that there is sufficient evidence to support a factual finding that no solemnization agreement was actually entered into by the parties in this instance. Accordingly, I would affirm the Court of Appeals' determination that the parties' marriage was not solemnized under a license.

## II.

Having determined that the parties have failed to meet the statutory requirements, I will briefly address the remaining arguments raised by MacDougall with regard to the nature of the parties' marriage. Turning first to MacDougall's argument that the defects in the parties' marriage may be cured by Code § 20-31, I agree with the Court of Appeals' holding on this matter. Notably, the lack of solemnization after the marriage license was acquired is not a mere

39

procedural defect that may be cured by Code § 20-31.[19]  By its plain language Code § 20-31 only validates marriages "solemnized under a license."  As I do not believe a solemnization occurred under license in the present case, the statute has no application here.

Even assuming the prerequisites for the application of the statute were met, none of the defects that can be cured by Code § 20-31 are present in this case.  The record indicates that the rabbi was properly qualified as an officiant in Virginia.  Therefore, he did not lack authority to perform weddings in Virginia.  Similarly, the statute allows for the correction of defects in the marriage license.  However, the defect that exists in the present case is not in the marriage license, it is in the marriage certificate.  Specifically, the rabbi's certification of a solemnization that never occurred.  Code § 20-31 cannot operate to cure the improper certification of a marriage that never occurred because it only cures defects in the marriage license, not the marriage certificate.  Thus, as the Court of Appeals adroitly stated, "[t]he medicine in Code § 20-31's cabinet is not formulated so as to spring to life a marriage that, in the eyes of Virginia law, never was."  *MacDougall*, 66 Va. App. at 70, 782 S.E.2d at 192.

I would also reject MacDougall's equitable estoppel argument.  Notably, such an equitable estoppel argument raises a number of significant public policy questions.  Where, as here, the parties have admittedly failed to meet the requirements of Code § 20-13, the application

---

[19] Code § 20-31 states:

> No marriage solemnized under a license issued in this Commonwealth by any person professing to be authorized to solemnize the same shall be deemed or adjudged to be void, nor shall the validity thereof be in any way affected on account of any want of authority in such person, or any defect, omission or imperfection in such license, if the marriage be in all other respects lawful, and be consummated with a full belief on the part of the persons so married, or either of them, that they have been lawfully joined in marriage.

40

of equitable defenses would effectively render those same requirements meaningless. Such a radical departure from established law is a matter for the legislature, not the judiciary. As the Court of Appeals explained,

> [t]he legislature is the rightful branch of government to set Virginia's public policy with regard to an institution so foundational, and of such paramount importance to society, as marriage. This area of Virginia law has been comprehensively regulated since 1628, if not earlier, and it is for the General Assembly to consider any modification to the statutory formalities for contracting lawful marriage.

*MacDougall*, 66 Va. App at 78-79, 782 S.E.2d at 196.

With regard to the question of whether equity bars Levick from challenging the validity of the marriage, our jurisprudence indicates that no such bar exists.

> [W]hatever may be the rule applicable to other contracts, public policy forbids that a complainant should be barred from bringing a suit to declare null a marriage contract which never had any valid existence. The State is interested to preserve the integrity of the marriage tie, and to enforce its laws against prohibited marriages, and general rules applicable to private contracts should not be permitted to thwart the public policy of the State established for the protection of society. If the marriage in controversy was void from its inception, the public is interested that it should be so declared . . .

*Heflinger v. Heflinger*, 136 Va. 289, 301-02, 118 S.E. 316, 319-20 (1923).

MacDougall attempts to distinguish *Heflinger* from the present case by noting that the marriage in *Heflinger* was bigamous and, therefore, statutorily void ab initio. MacDougall's argument, however, is misplaced. Our holding in *Heflinger* is based on the notion that public policy dictates that a void marriage should be declared as such; the reason why the marriage is invalidated does not change this underlying public policy.[20] Accordingly, I would affirm the

---

[20] MacDougall's reliance on *McNeir v. McNeir*, 178 Va. 285, 16 S.E.2d 632 (1941) and *Dry v. Rice*, 147 Va. 331, 137 S.E. 473 (1927), is similarly misplaced. Neither *McNeir* nor *Dry*

Court of Appeals' determination that equitable estoppel does not bar Levick from attacking the validity of the parties' marriage.

I cannot, however, agree with the Court of Appeals regarding its determination that the failure to follow the requirements of Code § 20-13 results in a voidable, as opposed to a void ab initio marriage. It has been recognized that

> [a] marriage is termed void when it is good for no legal purpose, and its invalidity may be maintained in any proceeding, in any court, between any parties, whether in the lifetime or after the death of the supposed husband and wife, and whether the question arises directly or collaterally.

1 Bishop, *supra*, § 258, at 107.

On the other hand,

> [a] marriage is voidable when in its constitution there is an imperfection which can be inquired into only, during the lives of both of the parties, in a proceeding to obtain a sentence declaring it null.

*Id.* § 259, at 107-08.

Along these lines, this Court has recognized that a void ab initio marriage "is a mere nullity" that "confers no legal rights, and, when it is determined that the marriage is void, it is as if no marriage had ever been performed." *Toler*, 173 Va. at 432, 4 S.E.2d at 367. Indeed, "[a] marriage void ab initio is no marriage at all." *Bray v. Landergren*, 161 Va. 699, 706, 172 S.E. 252, 254 (1933). In contrast, the parties to a voidable marriage "are husband and wife unless and until the marriage is annulled." *Payne v. Commonwealth*, 201 Va. 209, 211, 110 S.E.2d 252, 254 (1959). The primary difference between a voidable marriage and a void ab initio marriage is that

---

involved challenges to the validity of a marriage; rather both involved challenges to the validity of divorce decrees entered in another state. Clearly, such actions stand on entirely different footing with regard to the application of equitable principles.

a voidable marriage "may be afterwards ratified by the parties and become valid and usually is treated as a valid marriage until it is decreed void." *Toler*, 173 Va. at 432, 4 S.E.2d at 367.

In *Offield*, we explicitly held that the General Assembly's enactment of the precursor to Code § 20-13:

> wholly abrogated the common law in force in this State on the subject of marriages, and that no marriage *or attempted marriage*, if it took place in this State, can be held valid here, unless it has been shown to have been under a license, and solemnized according to our statutes.

100 Va. at 262-63, 40 S.E. at 914 (emphasis added). *See also Vanderpool v. Ryan*, 137 Va. 445, 448, 119 S.E. 65, 66 (1923) (recognizing "that a common law marriage, *or attempted marriage*, in Virginia, is void here is settled by the case of *Offield v. Davis*") (emphasis added).

Our holding in *Offield* is clear: by statute, marriages that take place in this state are valid only if they are solemnized under a license. *Id.* This means that a solemnization that occurs in the absence of a license cannot result in a marriage, just as the acquisition of a marriage license without a subsequent solemnization cannot result in a marriage. Both of these situations represent the failure to meet the threshold requirements of Code § 20-13. At best, such situations can only be referred to as attempted marriages, as no actual marriage actually came into being. An attempted marriage creates no duties or obligations between the parties; it has no effect upon the property rights of either party. It cannot be subsequently ratified by the parties and become valid as a result. In short, an attempted marriage is not a marriage; it is a nullity. *See Bray*, 161 Va. at 706, 172 S.E. at 254 (recognizing that a void ab initio marriage is the equivalent of "no marriage at all."); *Vanderpool*, 137 Va. at 448, 119 S.E. at 66 ("That a common law marriage, *or attempted marriage*, in Virginia, is void here is settled by the case of *Offield v. Davis*.") (emphasis added).

In reaching its conclusion that the parties' marriage was merely voidable, the Court of Appeals looked to the fact that the General Assembly had declared certain prohibited marriages void ab initio, whereas others were voidable. In taking this approach, the Court of Appeals analogized an attempted marriage with a prohibited marriage. However, an attempted marriage is necessarily distinct from a prohibited marriage in that every prohibited marriage, regardless of whether the prohibition renders the marriage void ab initio or voidable, has satisfied the threshold requirements of Code § 20-13; an attempted marriage has not. Thus, the fact that the General Assembly has designated certain prohibited marriages void ab initio and others merely voidable is of no consequence to this Court's consideration of whether an attempted marriage is void ab initio or voidable.

Rather, an attempted marriage is more akin to a common law marriage. In both instances, the threshold requirements of Code § 20-13 are not met. Thus, it is only logical that the Court treat attempted marriages in the same manner as we treat common law marriages. Therefore, attempted marriages, like common law marriages, are void ab initio. *See Offield*, 100 Va. at 262-63, 40 S.E. at 914.[21]

---

[21] The majority appears to misinterpret my logic on this matter. The parties' marriage is not void ab initio because it is "in violation of [my] view of solemnization;" it is void ab initio because no solemnization, and therefore no marriage, occurred. For over 100 years, this Court has recognized that a failure to meet the threshold requirements of our marital statutes cannot result in a valid marriage. *Offield*, 100 Va. at 263, 40 S.E. at 914. As the Court made no distinction between the various reasons why an attempted marriage might fail to meet the threshold requirements of our marital statutes, it is only logical that a solemnization without a license and a license without a solemnization lead to the same result: a void ab initio marriage.

Here, it is my position that the parties failed to meet the threshold requirements of Code § 20-13. Therefore, under *Offield*, no marriage has occurred; the purported or attempted marriage is a nullity (i.e., void ab initio).

Moreover, it is unclear why it would be necessary for the General Assembly to declare that the failure to follow Code § 20-13 results in a void ab initio marriage. Since this Court's decision in *Offield* over 100 years ago, that has been the law of the Commonwealth. Thus, the

44

In my opinion, the parties' failure to meet the threshold requirements of Code § 20-13 means that the parties were never married in the eyes of the law.[22]  Accordingly, I would find that no valid marital relationship existed between the parties and, therefore, their purported marital relationship was void ab initio.

### III.

With regard to the marital agreement entered into by the parties, I would affirm the Court of Appeals for the reasons articulated in its opinion.

### IV.

In conclusion, I cannot agree with the majority's flawed attempt to preserve a marriage that never actually existed under the law.  Rather, I believe that the judgment of the Court of Appeals that no marriage results where the parties fail to follow the statutory requirements of Code § 20-13 in the proper order should be affirmed.  I would, however, reverse the Court of Appeals' determination that an attempted marriage results in a voidable, rather than void ab

---

General Assembly would not need to declare that the failure to meet the threshold requirements of Code § 20-13 does not result in a marriage.  Indeed, the only reason the General Assembly would need to take such action is if it intended to change the law.  Given the over 100 years of legislative acquiescence in this matter, *see, e.g.*, *Cochran v. Commonwealth*, 258 Va. 604, 607, 521 S.E.2d 287, 289 (1999) (declaring that where the General Assembly "has not rejected or modified [the] judicial interpretation of [a] statute," the "construction given to the statute is presumed to be sanctioned by the legislature and therefore becomes obligatory upon the courts"), I am confident that the legislature fully intends for attempted marriages, like common law marriages, to remain void ab initio.

Similarly, the majority's reliance on *Payne* to argue that such marriages would be merely voidable is unavailing.  Notably, in *Payne*, the threshold requirements of Code § 20-13 were met and, therefore, a marriage was created.

[22] I recognize that this is a harsh result, but, as we explained in *Offield*, "'[h]owever this question is decided, it may result in hardship in some cases, but we think the lesser injury will come from an adherence to the statutory requisites than otherwise.'"  100 Va. at 261, 40 S.E. at 914 (quoting *In re Estate of McLaughlin*, 30 P. at 658-59).  Indeed, it would not be the first time this Court has enacted such a potent remedy.  In *Offield*, this Court declared that the first 14 years of the appellant's marriage to her husband was void ab initio.

45

initio, marriage. However, such reversal would not require the matter to be remanded, because, as the Court of Appeals explained below, "[t]his difference in reasoning may affect future cases involving a similar defect in the formation of a marriage, but it does not affect in practical terms the outcome of this case." *MacDougall*, 66 Va. App. at 92 n.19, 782 S.E.2d at 203 n.19. Finally, I would affirm the judgment of the Court of Appeals with regard to the decision to rescind the parties' marital agreement.

BK0119 0355 **COMMONWEALTH OF VIRGINIA**

**MARRIAGE REGISTER** 800069

COPY A
FOR CLERK OF COURT

CIRCUIT COURT FOR CITY OR COUNTY OF 119/355/0069 FAIRFAX COUNTY, VIRGINIA — CLERK'S NUMBER 0069

1 FULL NAME OF GROOM (first) RICHARD (middle) SCOTT (last) LEVICK

2 AGE 45 Years — 3 DATE OF BIRTH (Month, Day, Year) 12/10/57 — 4 PLACE OF BIRTH (state or foreign country) NEW YORK

5 RACE WHITE — 6 NUMBER OF THIS MARRIAGE (first, second, etc.) FIRST — 7 MARITAL STATUS (if previously married) WIDOWED ☐ DIVORCED ☐

GROOM 8 EDUCATION Elementary or Secondary (Specify only highest grade completed) 12 (0-12) College (1-4 or 5+) — 9a USUAL RESIDENCE STREET ADDRESS OR RT NUMBER 7602 SWINKS COURT

9b CITY OR TOWN OF RESIDENCE MCLEAN — 9c COUNTY (if independent city, leave blank) FAIRFAX — 9d STATE (OR FOREIGN COUNTRY) VIRGINIA

10 NAME OF FATHER ROBERT RICHARD LEVICK — 11 FULL MAIDEN NAME OF MOTHER MARLENE ROSENBLATT

12 PRESENT NAME OF BRIDE (first) DEBORAH (middle) ANN (last) MACDOUGALL — MAIDEN SURNAME (if different) POTTHOFF

13 AGE 40 Years — 14 DATE OF BIRTH (Month, Day, Year) 08/07/62 — 15 PLACE OF BIRTH (state or foreign country) MISSOURI

16 RACE WHITE — 17 NUMBER OF THIS MARRIAGE (first second etc.) SECOND — 18 MARITAL STATUS (if previously married) WIDOWED ☒ DIVORCED ☐

BRIDE 19 EDUCATION Elementary or Secondary (Specify only highest grade completed) 12 (0-12) College (1-4 or 4+) 4 — 20a USUAL RESIDENCE STREET ADDRESS OR RT NUMBER 7602 SWINKS COURT

20b CITY OR TOWN OF RESIDENCE MCLEAN — 20c COUNTY (if independent city leave blank) FAIRFAX — 20d STATE (OR FOREIGN COUNTRY) VIRGINIA

21 NAME OF FATHER WALTER POTTHOFF — 22 FULL MAIDEN NAME OF MOTHER PHEBE MARY MCKEON

23 TO ANY PERSON LICENSED TO PERFORM MARRIAGES **MARRIAGE LICENSE** You are hereby authorized to join the above-named persons in marriage under procedures published in the statutes of the Commonwealth of Virginia — Date Issued JANUARY 6, 2003 License Expires Sixty Days After Above Date

Signature ▶ *[signature]* Clerk of Court or Deputy — Date Received by Clerk of Court from Officiant FEB 11 2003

TO OFFICIANT
Complete and sign certificates on both copies
Return both copies within five days to Clerk of Court issuing license
Section 32 1-267 Code of Virginia

**MARRIAGE CERTIFICATE**

24 DATE OF MARRIAGE (Month Day Year) 1/21/03 — 25 PLACE OF MARRIAGE (county or independent city) MCLEAN VIRGINIA — 26 TYPE OF CEREMONY CIVIL ☐ RELIGIOUS ☒

27 I CERTIFY THAT I JOINED THE ABOVE-NAMED PERSONS IN MARRIAGE ON THE DATE AND AT THE PLACE SPECIFIED

SIGNATURE OF OFFICIANT ▶ *[signature]* — TITLE OF OFFICIANT RABBI

Authorized to perform marriages by the Circuit Court for ARLINGTON (city or county), Virginia, in 2002 (year of authorization)

NAME OF OFFICIANT (type or print) RABBI (BENJAMIN) BINYAMIN BIBER, MSW

ADDRESS OF OFFICIANT 9033 SLIGO CREEK PKWY #1410 (street or route number), SILVER SPRING MD (city or town) 20901-3355 (state)

ATTENTION OFFICIANT: You must be authorized by a Virginia Circuit Court to perform this marriage. License must be returned within 5 days of ceremony to Fairfax County Circuit Court, 4110 Chain Bridge Road, Fairfax, VA 22030

46