UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges Beales, O'Brien and Malveaux


MEREDITH HORTON

                                                         MEMORANDUM OPINION* BY
v.        Record No. 0275-18-2                           JUDGE RANDOLPH A. BEALES
                                                         DECEMBER 4, 2018

PETERSBURG DEPARTMENT OF
 SOCIAL SERVICES


          FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
                        Dennis M. Martin, Sr., Judge

          (Marlene A. Harris, on brief), for appellant.  Appellant submitting
          on brief.

          (Joan M. O'Donnell; Christopher B. Ackerman, Guardian *ad litem*
          for the infant child; Old Towne Lawyers, LLC, on brief), for
          appellee.  Appellee and Guardian *ad litem* submitting on brief.


       On January 22, 2018, the Circuit Court of the City of Petersburg entered separate orders

terminating the residual parental rights of Meredith Horton ("Horton") and Clayton Lancaster

("Lancaster")[1] in regard to their son, R.H.[2]  In her appeal, Horton argues that the circuit court erred

in terminating her residual parental rights and erred in finding it to be in R.H.'s best interests to

approve the goal of adoption.

---

       * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

       [1] Lancaster also appealed to this Court the order terminating his residual parental rights.
See Lancaster v. Petersburg Dep't of Soc. Servs., No. 0278-18-2, this day decided.

       [2] We use initials, instead of the child's name, in an attempt to better protect his privacy.

## I. BACKGROUND[3]

On appeal, we are required to view the evidence "in the light most favorable to the prevailing party below and its evidence is afforded all reasonable inferences fairly deducible therefrom." Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). Therefore, in this appeal, we view the evidence in the light most favorable to the Petersburg Department of Social Services (DSS), the prevailing party below.

In March 2015, Child Protective Services received a complaint against Horton and Lancaster in reference to their three-year-old son, R.H. The complaint alleged that there was insufficient food in the home, that the parents were using drugs, and that a neighbor had to care for R.H. Upon investigation, the Petersburg DSS found the home to be filthy and with insufficient food for the child. The parents also tested positive for illegal substances while R.H. was in their care. Horton tested positive for benzodiazepines, marijuana, and cocaine, and Lancaster tested positive for marijuana and benzodiazepines. On March 13, 2015, R.H. was physically removed from the home. On March 20, 2015, the Petersburg Juvenile and Domestic Relations District (J&DR) Court placed R.H. in the legal custody of his maternal grandmother ("grandmother"), under the supervision of the Petersburg DSS. On May 6, 2015, the J&DR court issued an order requiring the parents to remain drug free, submit to drug screening, maintain stable housing, participate in a substance abuse class, and work with DSS.

In August 2015, Horton was incarcerated for violating the terms and conditions of her probation from previous convictions for possession of a controlled substance. Also in August 2015,

---

[3] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record for purposes of resolving the issues raised by appellant. Evidence and factual findings below that are necessary in order to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1, 805 S.E.2d 775, 777 n.1 (2017).

while Horton was incarcerated, DSS discovered that grandmother had traveled out of town, leaving R.H. in the care of Lancaster. Doing so violated the safety plan that was in place as well as the specific instructions given to grandmother. Consequently, R.H. was removed on August 20, 2015, and on August 27, 2015, the J&DR court granted temporary legal custody to the Petersburg DSS. Horton remained incarcerated until November 2015, when she was released on supervised probation.

On October 21, 2015, the J&DR court approved a foster care plan that placed R.H. with foster parents. The foster care plan included a number of responsibilities and requirements with which Horton was to comply, including, *inter alia*, requirements to maintain stable, adequate, and independent housing with no interruption in utilities for at least six months; to obtain and maintain steady employment; to participate in a substance abuse evaluation and any recommended treatment; to undergo a psychological evaluation; to participate in mental health support services; to take parenting classes; and to participate in supervised visitation with R.H.

In January 2016, in its foster care service plan review, which identified the goal of returning R.H. home to be with his parents, DSS reported that Horton had begun substance abuse treatment. On February 9, 2016, Horton completed her court-ordered psychological evaluation. In its June 2016 foster care service plan review, which maintained the goal of returning R.H. to be home with his parents, DSS reported that Horton had a job, but was inconsistent about providing pay stubs to DSS. She had begun taking parenting classes and continued substance abuse treatment. She consistently participated in biweekly supervised visits with R.H. She did not have independent housing, but was residing with grandmother. In November 2016, DSS noted "some progress," including that parents had obtained appropriate housing and completed parenting classes, and Horton regularly participated in visitations and tested negative on all drug

screenings.  With DSS permission, R.H. was then participating in unsupervised visits with Horton.

At the time of the March 2017 DSS foster care service plan review, DSS was in the process of attempting to initiate overnight stays of R.H. with his parents.  However, the overnight stays never took place because, according to the testimony of the foster care social worker to whom R.H. was assigned, "the parents had just regressed."  Specifically, Horton did not have verified employment and had not completed her substance abuse treatment or her mental health treatment.  Both parents no longer had independent housing, but were instead living with grandmother.  Horton's last visitation with R.H. was on January 24, 2017.  Horton had not been in contact with DSS, and DSS did not know Horton's location.  In its March 2017 foster care service plan review, DSS continued to recommend the goal of returning R.H. home to be with his parents, but the J&DR court disapproved the goal and directed DSS to submit a new plan with the goal of adoption.  In May 2017, DSS submitted a plan with the goal of adoption, which the J&DR court approved in June 2017.

On April 6, 2017, Horton was again incarcerated for violating the terms and conditions of her probation from previous convictions.  She remained incarcerated until January 2018.

On January 22, 2018, the City of Petersburg Circuit Court held an *ore tenus* hearing concerning termination of the parents' parental rights.  Evidence was presented that, as of the date of the hearing, Horton's last visitation with R.H. was on January 24, 2017.  She had not provided to DSS certification of completion of substance abuse treatment or mental health treatment (although she testified she had participated in substance abuse treatment while incarcerated and had scheduled an appointment at a mental health facility).  She did not have housing (although she testified that she planned to move into her friend's trailer, where Lancaster

- 4 -

and her friend were living). She did not have a job (although she testified that she had three job prospects).

During the hearing, R.H.'s therapist, who was qualified by the circuit court as an expert in child psychology, testified that he had been meeting with R.H. for several years and had conducted approximately thirty sessions with R.H. He testified that, although at first R.H. was consumed with "safety kind of issues and predictability kind of issues," R.H. had "come a very, very long way." The therapist also opined that "as long as he's in a predictable environment, he's getting the services he needs, there's no reason to think he's not going to have a good future and going to continue to progress." The therapist also stated that R.H. is aware that there may be an adoption in the future or some change from his current foster home.

At the conclusion of the *ore tenus* hearing, the circuit court approved a foster care plan with a final goal of adoption and terminated the parents' residual parental rights pursuant to Code § 16.1-283(C)(2).

## II. ANALYSIS

When reviewing a circuit court's decision to terminate residual parental rights,

> this Court presumes that the trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." The circuit court has "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Therefore, in a case involving termination of parental rights, "[t]he trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'"

Eaton v. Wash. Cty. Dep't of Soc. Servs., 66 Va. App. 317, 324, 785 S.E.2d 231, 235 (2016) (first quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005); then quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990); and then quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659).

A. Termination of Parental Rights

The circuit court terminated Horton's residual parental rights pursuant to Code

§ 16.1-283(C), which states, in pertinent part:

> The residual parental rights of a parent or parents of a child placed
> in foster care as a result of court commitment . . . may be
> terminated if the court finds, based upon clear and convincing
> evidence, that it is in the best interests of the child and that . . .
> 2. The parent or parents, without good cause, have been unwilling
> or unable within a reasonable period of time not to exceed 12
> months from the date the child was placed in foster care to remedy
> substantially the conditions which led to or required continuation
> of the child's foster care placement, notwithstanding the
> reasonable and appropriate efforts of social, medical, mental health
> or other rehabilitative agencies to such end.

Horton's first assignment of error – that the circuit court erred in finding that Horton had

not substantially remedied the issues that brought the child into foster care – consists of two main

arguments. First, she argues that the initial reason for removal of the child was an unclean home,

insufficient food, and no one to care for the child. The foster care plan which imposed

requirements on Horton did not address those three initial issues. She further argues that even

considering the requirements imposed, Horton substantially complied because she "complied

with at least five of the seven requirements." We will address these two arguments in turn.

Horton's first argument has no merit because it fails to take into account the full range of

circumstances surrounding R.H.'s foster care placement. R.H. was removed from his parents'

home in March 2015 as a result of DSS's finding that the home was filthy, that there was

insufficient food, and that both parents tested positive for illegal substances. This removal did

not result in R.H.'s immediate placement in foster care. Instead, legal custody of R.H. was given

to grandmother. Subsequently, on May 6, 2015, the J&DR court issued an order requiring the

parents to remain drug free, submit to drug screening, maintain stable housing, participate in a

substance abuse class, and participate with DSS. In August 2015, R.H. was removed from the

custody of his grandmother and placed in the custody of DSS. The evidence shows that at that time, Horton was incarcerated. We conclude that "the conditions which led to or required continuation of the child's foster care placement" (Code § 16.1-283(C)(2)) included a number of circumstances put in place, at least in part, by Horton, including her drug use, her incarceration, and her failure to provide adequate housing and care for R.H.

Horton was incarcerated twice since the time that R.H. was placed in foster care – from August to November 2015 and from April 2017 to January 2018 – being released only days before the circuit court hearing on the termination of her residual parental rights. While incarceration alone is not sufficient grounds to terminate someone's residual parental rights, incarceration is certainly a relevant factor among others to consider when a court reviews the totality of the circumstances in deciding whether to terminate residual parental rights. See Ferguson v. Stafford Cty. Dep't of Soc. Servs., 14 Va. App. 333, 340, 417 S.E.2d 1, 5 (1992).

Horton's second argument fails because it is factually inaccurate. Horton contends that "at various times [she] complied with at least five of the seven requirements" imposed by DSS. However, the foster care plan signed on October 6, 2015, which was approved by the J&DR court, lists twelve requirements imposed on Horton. Under responsibilities noted for Horton, the foster care plan includes the following numbered list:

> 1. Maintain safe, stable and adequate housing. Stable housing is defined as residing in the same residence for a minimum of six months with no interruption in utilities. Submit monthly copies of rent receipts and utilities.
> 2. Obtain stable employment or income and submit pay stubs monthly to verify employment or income verification.
> 3. Provide child support as determined by the Division of Child Support Enforcement or the Petersburg Juvenile and Domestic Relations Court.
> 4. Participate in substance abuse assessment and complete any recommended treatment.
> 5. Participate in psychological evaluation and complete any recommended treatment.

6.  Participate in parenting classes and demonstrate knowledge of skills learned.
7.  Participate in visitation as arranged by PDSS and demonstrate the ability to care for [R.H.] and interact in a loving and appropriate manner.
8.  Sign releases for all service providers, so that PDSS can monitor progress in all areas of service.
9.  Maintain bi-weekly contact with PDSS.  Ms. Horton is to notify the agency within 48 hours of any change in residence, employment, or health.
10.  Submit to random drug screenings.
11.  Attend planning meetings for [R.H.]
12.  Refrain from drug and alcohol use.

Horton acknowledges that her alleged compliance was "at various times."  She lists that she, at various points in time, had a residence, had employment, was seeing a mental health professional, was testing negative for drug use, and was visiting with her child.  While all this may be true, the fact remains that, at the time of the *ore tenus* hearing on January 22, 2018, she did not have independent housing or confirmed employment and had not seen R.H. for one year (not only while she was incarcerated but for some time even before she was incarcerated).  At the time of the *ore tenus* hearing, Horton cannot pick and choose various points of time in the past when she was in compliance (or near compliance) with various requirements – and then ask the court to accumulate those various times of compliance while ignoring the times of non-compliance or lack of substantial remedying of the identified problems.

Even if we were to assume, as Horton argues, that Horton complied with five requirements, we will not assume that Horton's compliance with five out of twelve requirements constitutes substantial remedying of the problems and issues that caused R.H. to be removed from the home and placed in foster care.

Code § 16.1-283(C)(2), in addition to the language quoted *supra*, explicitly states:

> Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement *in accordance with their obligations* under

and within the time limits or goals *set forth in a foster care plan filed with the court* . . . shall constitute prima facie evidence of this condition.

(Emphasis added). In light of the evidence that Horton failed to substantially comply with the goals set out for her in the foster care plan approved by the J&DR court, it is clear that the circuit court's decision terminating Horton's residual parental rights was not plainly wrong or without evidence to support it.

### B. Goal of Adoption

Horton's second assignment of error is that it was not in R.H.'s best interests for the court to approve the goal of adoption. Horton argues that, because R.H.'s therapist noted R.H. suffered from adjustment disorder and because placement in an adoptive home would require R.H. to be moved again since the foster home in which he was living was allegedly not an adoptive home, it was not in R.H.'s best interests to be moved simply in order to be adopted.

Even assuming that the court's approval of the permanent goal of adoption would require R.H. to move out of his current foster home, Horton's argument fails. As noted *supra*, the circuit court remarked that R.H. had been in foster care for twenty-nine months by the time of the January 22, 2018 *ore tenus* hearing. Considering Horton's record, the circuit court also noted that whatever temporary improvements Horton made, she repeatedly regressed. The circuit court concluded, in referring to Horton and Lancaster, "There may be periods of where they're sober, and there may be periods where they're doing okay, but based upon the testimony I heard today, we're going right back to where we was, and that's not beneficial to [R.H.]."

This Court has stated, "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). In light of that principle, considering the totality of the evidence in this

case, the circuit court certainly could have reasonably concluded that it clearly was in R.H.'s best interests to terminate Horton's residual parental rights and then to approve the goal of adoption.

III.  CONCLUSION

In light of Horton's failure to comply with most of the requirements imposed upon her by the foster care plan approved by the J&DR court on October 21, 2015, there was *prima facie* evidence that Horton was unwilling or unable to remedy substantially the conditions which led to R.H.'s placement in foster care.  Furthermore, in light of the fact that R.H. had been in foster care for twenty-nine months, which is well beyond the twelve months provided in Code § 16.1-283(C)(2), we cannot say that the circuit court's conclusion – that it was in R.H.'s best interests to terminate Horton's parental rights and to approve the permanent goal of adoption – was plainly wrong or without evidence to support it.

For all of these reasons, we affirm the circuit court.

Affirmed.