PRESENT: All the Justices

JOSEPH TAYLOR BROWN

v.  Record No. 220643

VIRGINIA STATE BAR, EX REL.
SIXTH DISTRICT COMMITTEE

OPINION BY
JUSTICE THOMAS P. MANN
MAY 4, 2023

FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Steven C. McCallum, Chief Judge Designate, Jeanette A. Irby
and Dontaé L. Bugg, Judges Designate

In this appeal of right from an attorney disciplinary proceeding before a three-judge panel, we consider whether an attorney violated Rule 1.7(a)(2) of the Virginia Rules of Professional Conduct by engaging in sexual relations with his divorce client during the representation.

Joseph Taylor Brown ("Brown") assigns error to the finding of the three-judge panel ("circuit court") that he added an additional or new ground against his client in her divorce litigation, its conclusion that he violated Rule 1.7(a)(2), and the length and detail of the memorandum order.  The Virginia State Bar (the "Bar") assigns cross-error to the circuit court's finding that Brown did not violate Rule 2.1.  Because there was overwhelming evidence to support the circuit court's memorandum order with respect to Rule 1.7(a)(2) and the Bar requested no additional relief regarding its assignment of cross-error, we affirm.

BACKGROUND[1]

Brown obtained his license to practice law in Virginia in 2001 and has been a licensed Virginia attorney at all times relevant to his conduct in this case. He is the sole member of The Law Offices of Joseph T. Brown, practicing predominantly criminal and family law. Brown undertook legal representation of C.C. in highly contested custody, divorce, criminal and protective order litigation following an initial consultation with her in 2017.[2]

BROWN'S EARLY REPRESENTATION OF C.C.

C.C. and her husband M.C.[3] were married in 2013 and have two children. Throughout the marriage, C.C. struggled with drug and alcohol addiction. Beginning in 2015, C.C. was admitted to a drug and alcohol rehabilitation facility in California. Throughout the remainder of the marriage, C.C. was admitted to approximately six different rehabilitation facilities for substance abuse, until she became sober in July 2020. However, based on the record before us, her recovery was fragile and tenuous.

---

[1] In reviewing Brown's assignments of error, "[w]e consider the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Bar, the prevailing party in the trial court." *Weatherbee v. Virginia State Bar ex rel. Fourth Dist.-Section I Comm.*, 279 Va. 303, 306 (2010) (quoting *Anthony v. Virginia State Bar ex rel. Ninth Dist. Comm.*, 270 Va. 601, 608-09 (2005)).
Regarding the Bar's assignment of cross-error, ordinarily we "consider the evidence and all reasonable inferences that may be drawn in the light most favorable to [the respondent], the prevailing party on this issue in the circuit court." *Weatherbee*, 279 Va. at 307 (alteration added). However, because we decline to address the Bar's assignment of cross-error, *see infra* section II, we find it unnecessary to restate the record below in the light most favorable to Brown.

[2] To the extent that this opinion discusses facts found in sealed documents in the record, we unseal only those facts. *See Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017). Additionally, given the sensitive nature of the underlying facts, we refer to C.C. and M.C. by their initials.

[3] M.C. is the complainant whose bar complaint initiated this case.

2

In June 2017, an incident occurred at C.C. and M.C.'s home, when M.C. threw away C.C.'s prescription pills. Following that event, M.C. filed an assault and battery charge against C.C., and C.C. obtained a preliminary protective order and a six-month protective order against M.C. (the "first protective order"). M.C. filed a petition for custody in the Spotsylvania Juvenile and Domestic Relations District Court ("JDR Court") and also filed for divorce in the Spotsylvania County Circuit Court. M.C.'s complaint for divorce alleged adultery and constructive desertion as fault grounds for divorce.

C.C. retained Brown in August of 2017 to represent her in four matters: (1) the first protective order, which M.C. had appealed to the circuit court, (2) C.C.'s defense in her domestic assault and battery criminal case, (3) C.C.'s opposition to M.C.'s custody petition, and (4) the divorce case. Once retained, Brown issued discovery requests and filed an answer and "cross complaint" in the divorce case, alleging the fault ground of cruelty. Brown also represented C.C. during depositions of C.C.'s alleged paramours, which had been noticed by M.C. Those depositions elicited testimony detailing occurrences where C.C. had sexual relations with multiple men, often while abusing drugs and or alcohol. Additionally, exhibits which Brown received that day were submitted during the deposition by M.C., detailing C.C.'s previous sexual relations with paramours.

During his representation, Brown obtained C.C.'s medical and mental health records and became familiar with her medical history, including her diagnoses of anxiety, depression, and post-traumatic stress disorder. Brown also attended a pretrial hearing related to the custody petition in JDR Court and issued discovery in that case. Brown defended C.C. in her criminal case; she was convicted of domestic assault and battery and Brown appealed to the circuit court where he continued with C.C.'s representation.

In September 2017, C.C. called Brown and told him that she had initiated contact with M.C. and that they engaged in sexual relations. She also stated the couple was living together with their children in Texas and might reconcile. As a result, C.C. withdrew the first protective order. The next month, C.C. told Brown that she had signed a marital settlement agreement (the "Agreement") without Brown's assistance, but said she wanted to contest the Agreement. In November 2017, M.C. nonsuited his custody petition. The circuit court declined to incorporate the Agreement in the divorce matter but set a further hearing in the case for March 2018.

By the date of C.C.'s criminal appeal in January 2018, the parties were no longer pursuing active litigation. The Commonwealth offered C.C. a deferred disposition, conditioned on her completing the Fresh Start anger management course and maintaining good behavior. If she was successful, the charge would be dismissed. At the same time, C.C. told Brown that she no longer wished to contest the Agreement. Brown had limited contact with C.C. through the rest of 2018, and no contact with her during 2019.

BROWN'S REPRESENTATION OF C.C. CONTINUES

On May 4, 2020, Brown reached out to C.C., indicating that she needed to update him on "everything since [they] last talked" and he requested a phone call the next day. Brown had received a notice from the circuit court that C.C. failed to provide documentation regarding her completion of the Fresh Start program as part of her deferred disposition related to the criminal appeal on the assault and battery charge. Brown also received a call from one of M.C.'s prior attorneys, who claimed that C.C. was "posting child pornography" and "posting pornography and pictures of the children" to her social media accounts.[4]

---

[4] The circuit court's memorandum order characterized the allegations as "posting pornography on her social media accounts." We make no comment on the veracity of such

4

On May 6, 2020, C.C. spoke with Brown and told him that she "was getting divorced for real this time." She also told him that she was also on probation for a new criminal conviction, public disturbance, and that M.C. had obtained a protective order against her (the "second protective order"). Brown, who was still listed as C.C.'s counsel of record, texted C.C. and advised her that she could "get rid of" the Agreement because it did not contain a reconciliation provision. Brown stated that since C.C. and M.C. had lived together for two years following the Agreement, "that should blow it up." He also explained that by living together following the initial separation, "[M.C.] has condoned all of the adultery he was trying to prove and can't use it anymore."

Brown also counseled C.C. to retain all text messages and emails with M.C. C.C. confirmed that she had a significant number of messages, and that M.C. was discussing getting back together in writing. C.C. and Brown discussed the next steps in her case, with Brown recommending that "we file to dismiss the current divorce" case, based on of the reconciliation, and "then file custody[,] visitation[,] spousal[,] and child support in [the JDR court.]"

The next day, May 7, Brown texted C.C. and asked her if she had discussed her legal fees with her family and requested that she call him. C.C. did not respond about the call or legal fees, but updated Brown that M.C. had hired a new attorney.

The conversation began to take on a different tone when Brown and C.C. began discussing her political beliefs, and Brown messaged that he thought she was a "right wing nut job like he is." C.C. told Brown that she was a libertarian, to which he responded, "I might help

allegations, which C.C. substantively denied in her conversations with Brown. Rather, we include such facts as part of the purported basis for Brown and C.C.'s meeting at the hotel.

5

you see the error of your ways though [smiling emoji]." C.C. replied, "I'd love to hear about my errors" to which Brown asked, "and some reconditioning?" C.C. answered, "[p]ossibly."

Immediately after this conversation, C.C. sent Brown a picture of herself with a black eye from 2019. Brown and C.C. discussed the photo, and whether she had used it at the first protective order hearing. C.C. mentioned that M.C. made her delete the photo, and Brown advised that she change her phone passwords. They continued to discuss her divorce case by text, until approximately 11 p.m., when C.C. stopped responding.

On the morning of May 8, C.C. texted Brown and told him she had fallen asleep. The following conversation[5] ensued:

| Brown: | it's hard to keep you awake over text |
|---|---|
| C.C.: | It is!! Ima visual and sound kinda girl |
| Brown: | so would need to be in person |
| C.C.: | Basically |
| Brown: | sounds like fun |
| C.C.: | Lol shut up [crying laughing emoji] |
| Brown: | I'm not wrong [smiling emoji] |
| C.C.: | Ur really not |

Immediately following this conversation, Brown and C.C. discussed her employment status. Brown sent C.C. a listing for employment as a COVID-19 contact tracer, leading to the following:

| Brown: | Just saw that Virginia is hiring people to be contact tracers for covid. Hiring 1000 people. 100% remote (need phone, computer and internet) at least 2 months. $17-$28 per hour |
|---|---|
| C.C.: | Whered u see this |
| Brown: | on reddit post. Go to jobs.virginia.gov |
| C.C.: | Ok |
| Brown: | What happened to yes Sir?? |
| C.C.: | Oh dam. Yes master |
| Brown: | Even better [smiling emoji] |

---

[5] All block quoted text messages are provided verbatim, except for profanity. It should be noted the exchanges set out in this opinion between Brown and C.C. are a representative sample as these communications were extensive, graphic and explicit.

C.C.:      Oh jeezus lol
Brown:     don't judge
C.C.:      I'm not at all.  There are no rules in quarantine.
Brown:     oh there are rules
C.C.:      Not on my end
Brown:     You'll find that things will go well if you do what you're told

On May 9, Brown and C.C. discussed C.C.'s interest in therapy, and then began

discussing television:

Brown:     What are you watching
C.C.:      Snapped
Brown:     Planning a murder? [smiling emoji]
C.C.       This is all I watch.  I call it my murder porn
Brown:     lol I prefer real porn

Immediately after this conversation, Brown and C.C. discussed her history and

experience with abuse, the fact that she had "zero friends," and that she was cut off from

everyone.  Brown texted a diagram explaining the cycle of abuse to explain M.C.'s conduct by

"[cutting her] off from everyone" and that "They want you weakened so you don't have the

resources."



7

They continued discussing her mental health issues and therapy. Around 1 a.m. Brown texted C.C. about meeting up in person in the future. Brown and C.C. continued texting for two more hours. Around 2 a.m. C.C. messaged Brown that M.C. had texted her. Brown advised her to save those messages, and not message M.C. back, because that could be a violation of the second protective order. Their conversation then turned to C.C.'s age:

| | |
|---|---|
| C.C.: | I feel like 110 |
| | Im like a grumpy ol woman |
| Brown: | well you don't look 110 |
| C.C.: | Yes I do too |
| Brown: | I saw your fb pics and must disagree |
| C.C.: | How? I thought my sh*t was private |
| Brown: | there are a few that are public |
| C.C.: | Ahhhh like my profile duh |
| Brown: | yeah probably |
| | you look young |
| C.C.: | Like younger than my age? |
| Brown: | Yeah like in your 20s |

C.C. then sent Brown two photos of herself, to which Brown responded, "you look like you're not old enough to drink." Around 4 a.m. a day later C.C. texted Brown "[p]lease don't let me keep u up." Brown and C.C. had the following exchange:

| | |
|---|---|
| Brown: | it's ok I'm enjoying u |
| C.C.: | Me too |
| Brown: | you ain't seen nothing yet [smiling emoji] |
| C.C.: | Oh my what does that mean lol |
| Brown: | you'll just have to find out won't you? |
| C.C.: | Yesssss |
| Brown: | mmmm |
| C.C.: | Well that escalated quickly |
| Brown: | kinda yeah |

At that point, Brown mentioned that their "first meeting escalated a lot quicker." They discussed the fact that C.C. had sent him a revealing picture. C.C. stated that she did not remember the meeting but remembered sending Brown the picture. Brown replied that it had been a while, and that he likely erased the photo to keep it from his wife. He then suggested she

8

could "send it again [smiling emoji]" to which C.C. responded "[n]o way!" Brown continued the conversation:

| Brown: | wait why would that pic you sent be horrific? |
| | or you just kinda embarrassed for sending it? |
| C.C.: | 1) u were my lawyer 2) u were married 3) u were my lawyer |
| | And I remember I was sending it to the guy I was seeing at the time |
| | But I sent it to you instead on accident |
| Brown: | oh you sent it by accident? |
| | Lol that sucks |
| | Prob subconsciously you wanted to send it to me |
| C.C. | Omg!! U thought i meant to send that to you |

Brown told her that "whether there is more escalation or not, I'm still going to be here for you. Want you to know that. One has nothing to do with the other." Brown then texted her "you told me you straight up wanted to f**k within like 4 minutes after we sat down" in our first meeting. Brown texted her "it made my day. And I was thinking the same but I didn't let on. Trying to be professional and hold it together and all." When C.C. texted that she did not remember and that she probably blocked it out, Brown stated that he was surprised she did not remember and that "it was pretty hot actually." Brown then stated that "it was definitely difficult to remain professional and not bend you over the table right there in the conference room lol."

On the morning of May 10, Brown and C.C. discussed a plan to get together "to be social" on the following Tuesday, May 12, 2020. Their conversation turned to the topic of their sexual fantasies, including submission and domination. Brown proceeded to inform C.C. about the differences and gradations of subservience with Brown telling C.C. she "need[ed] a spanking," and that their conversation was "turning [him] on." C.C. stated she "just want[ed] to get off" and Brown replied, "I'll teach you." She stated, "I just want an orgasm" and Brown replied, "you will get what you want." Brown and C.C. continued discussing their sexual

9

fantasies, including C.C. saying "I mean I do love a good rape scenario" before eventually

returning to their plans for that Tuesday:

| | |
|---|---|
| C.C.: | Now i want sex. Tyvm |
| Brown: | What are you going to do about it |
| C.C.: | Hook up with someone tomorrow |
| Brown: | lol can't wait until Tuesday? |
| C.C.: | Oh were gonna f**k at ur office |
| Brown: | or somewhere |
| | We're going to go somewhere else |
| C.C.: | We are? |
| Brown: | Yeah. I don't want to be rushed |

C.C. asked Brown if this was his "intention the whole time" and he answered, "no. I knew it was

possible but wasn't going to act on it because it wouldn't be good if it got out. But after talking

about it I can't help myself. We've always had a lot of chemistry and tension like that." Brown

and C.C. continued discussing their sexual fantasies, involving Brown's predilection for

domination using rope, and exchanging photographs.[6]

Over the next four hours C.C. and Brown continued discussing their past sexual history

and sexual fantasies in graphic detail. At one point, C.C. stated "I need to be penetrated" and

Brown responds "yes you need to be penetrated." They also discussed the possibility of having

sex while on illicit drugs, specifically "X Or molly."[7] Brown continued the conversation:

| | |
|---|---|
| Brown: | Can you get it? |
| C.C.: | Yes. Im on probabtion though. I was high all last summer on Molly, I was a skeleton. |
| Brown: | oh yeah don't f**k with probation |
| C.C. | Have u ever had sex on stuff like that |
| Brown: | yep |

---

[6] This exchange occurred on May 10, 2020, four days after Brown explained the legal consequences of condonation. *See supra* at 5.

[7] X and Molly are also names for MDMA. *See* Drug Enforcement Administration, Ecstasy Or MDMA (also Known As Molly) (March 22, 2023), https://www.dea.gov/factsheets/ecstasy-or-mdma-also-known-molly.

The next day, May 11, C.C. reached out to Brown about her divorce case, because M.C. had been texting her. Brown responded "don't tell him anything about our legal plans. I want it to be a surprise." They continued to discuss M.C.'s income and child support in C.C.'s case. Throughout the day, and up until the afternoon on May 12, Brown and C.C. continued to exchange texts about their relationship and sexual interests.

The evening of May 12, C.C. and Brown met at a hotel in Fredericksburg, Virginia, purportedly to discuss the allegations that C.C. was posting child pornography to social media. While at the hotel, Brown and C.C. had sex. That evening, a hotel employee who knew M.C. told him C.C. was there with a man. M.C. sent his private investigator to the hotel to obtain evidence of the encounter. M.C. called the hotel and asked to be connected to Brown's room; Brown answered and M.C. disconnected the call. After spending two hours with C.C., Brown left the hotel around 6 p.m.

M.C.'s private investigator obtained video of C.C. leaving the hotel at 7:37 p.m. C.C. then messaged M.C. in response to allegations M.C. sent her, denying meeting with Brown at the hotel. Later that evening, C.C. was arrested for DWI. After being released from the jail, C.C. called M.C. back. C.C. told M.C. that her mother had locked her out of the house, but that C.C. "felt that she may have been raped because she couldn't remember anything, thought she was slipped something."[8] M.C. picked C.C. up and brought her to the hospital but remained outside. According to M.C., C.C. had "rope or fabric burns on her hands and wrists."[9] C.C. left the hospital, claiming they did not have "the appropriate kits to do any testing there." Because the

---

[8] M.C. stated this at trial and emphasized "I take that allegation seriously and I don't want to try to imply that at all."

[9] The officer who arrested C.C. testified by affidavit that he did not observe "any bruising, burns, or other marks on her body, including her hands and arms."

11

second protective order was in place, M.C. drove C.C. to her mother's house rather than his home. That evening M.C. emailed Brown demanding that he withdraw as C.C.'s counsel and stating he would be sending an ethics complaint to the Virginia State Bar.

BROWN'S WITHDRAWAL AND THE BAR INVESTIGATION

After contacting his counsel, Brown filed a motion to withdraw as C.C.'s counsel in the divorce case on May 20, 2020, citing a conflict of interest. The withdrawal order was entered on July 10, 2020. Brown filed a motion to withdraw in the criminal case on May 27, 2020, and the motion was granted on June 19, 2020. C.C. proceeded in the divorce case pro se, and a final order of divorce was entered in September 2020, incorporating the Agreement, with limited modifications.

On May 14, 2020, M.C. filed a complaint with the Virginia State Bar. Following the complaint, Virginia State Bar Investigator Lisa Marshall ("Marshall") investigated the allegations and prepared both a report and supplemental report of her investigation. In September 2021, the Sixth District Subcommittee of the Virginia State Bar found that Brown's actions "constitute[d] misconduct" and certified the matter to the Virginia State Bar Disciplinary Board, finding that Brown had violated Rules 1.7(a)(2) and 2.1. Brown answered the certification, denying that he violated either Rule and requested a three-judge panel pursuant to Code § 54.1-3935.

THE DISCIPLINARY PROCEEDINGS

In March 2022, a two-day trial occurred on the disciplinary charges before a three-judge panel. During the trial, Brown, M.C., and Marshall testified. Brown admitted to having sexual relations with C.C., but specifically denied restraining her, consuming drugs or alcohol, and bringing drugs, alcohol, or rope. He also stated that C.C. appeared completely normal.

12

The circuit court found that Brown violated Rule 1.7(a)(2) but did not violate Rule 2.1. Its memorandum order contained a four-page, seventeen paragraph summary of the facts of the case. As a sanction, Brown received a public reprimand, with terms, requiring him to retake the Multistate Professional Responsibility Exam and complete 250 hours of community service. If Brown failed to comply with the terms, his license would be suspended for a year and a day.[10] Brown appeals to this Court.

## ANALYSIS

### I. BROWN'S APPEAL

Brown assigns error to (A) the circuit court's finding that his conduct added additional or new ground for divorce, (B) the circuit court's finding that he violated Rule 1.7(a)(2), and (C) the length and detail of the circuit court's statement of facts.

### STANDARD OF REVIEW

In an appeal from a three-judge panel, "[w]e conduct an independent examination of the entire record. We consider the evidence and all reasonable inferences that may be drawn from

---

[10] This is a serious penalty, as reinstatement after any suspension in excess of one year would require Brown to demonstrate, by clear and convincing evidence, that he had:

> 1. Attended 12 hours of continuing legal education, of which at least two hours shall be in the area of legal ethics or professionalism, for every year or fraction thereof of the Suspension;
> 2. Taken the Multistate Professional Responsibility Examination since imposition of discipline and received a scaled score of 85 or higher;
> 3. Reimbursed the Bar's Clients' Protection Fund for any sums of money it may have paid as a result of the Attorney's Misconduct;
> 4. Paid to the Bar all Costs that have been assessed against him or her, together with any interest due thereon at the judgment rate at the time the Costs are paid; and
> 5. Reimbursed the Bar for any sums of money it may have paid as a result of a receivership involving Petitioner's law practice.

Va. Sup. Ct. R., Part 6, § IV, ¶ 13-18(P).

13

the evidence in the light most favorable to the Bar, the prevailing party in the trial court."

*Anthony*, 270 Va. at 608-09. "We accord the trial court's factual findings substantial weight and

view those findings as prima facie correct." *Id.* at 609. Moreover, while "we do not give the

trial court's conclusions the weight of a jury verdict, we will sustain those conclusions unless it

appears that they are not justified by a reasonable view of the evidence or are contrary to law."

*Id.*

Regarding the interpretation of the Virginia Rules of Professional Conduct, "[t]he

interpretation of disciplinary rules is subject to de novo review." *Baumann v. Virginia State Bar*,

299 Va. 80, 87 (2020).

### A. NEW OR ADDITIONAL GROUND FOR DIVORCE

Brown first assigns error to the court's finding that he created a new or additional ground

for divorce in C.C.'s case. Specifically, Brown argues that his conduct could not have created a

new or additional ground because there was previous evidence of adultery by both C.C. and

M.C., as well as reconciliation and condonation on the part of M.C.

As a threshold matter, we note that this is an attorney disciplinary matter, not a divorce

case. Yet, because Brown argues that the circuit court's finding influenced its conclusion that he

violated Rule 1.7(a)(2), we address his argument. Adultery is a fault-based ground for divorce.

Code § 20-91(A)(1). In addition to being a ground for divorce, adultery is a criminal offense.

Code § 18.2-365. A married individual commits adultery when they "voluntarily . . . have sexual

intercourse with any person not his or her spouse." Code § 18.2-365. There are multiple

affirmative defenses to the adultery ground for divorce, including condonation and recrimination.

Condonation is "the remission, by one of the married parties, of an offense which he knows the

other has committed against the marriage, on the condition of being continually afterward treated

14

by the other with conjugal kindness." *Cutlip v. Cutlip*, 8 Va. App. 618, 621, (1989) (quoting *Owens v. Owens*, 96 Va. 191, 195 (1898)). "Conjugal kindness requires that the guilty spouse 'shall not only refrain from a repetition of the offense forgiven, but shall also refrain from committing any other offense which falls within the cognizance of a matrimonial court.'" *Id.* (quoting *Michels v. Michels*, 110 N.J. Eq. 393, 395, 160 A. 518, 519 (1932)). Additionally, condoned adultery can be revived "where the guilty party resumes his association with his paramour." *Id.* Recrimination likewise constitutes a defense to adultery, and "bars granting a divorce where the complainant's own actions constitute ground for divorce." *Venable v. Venable*, 2 Va. App. 178, 184 (1986).

Importantly, both are affirmative defenses, separate and distinct from the plaintiff's adultery ground. An "affirmative defense" is a "defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true." Black's Law Dictionary 528 (11th ed. 2019); *see also, Williams v. Commonwealth*, 57 Va. App. 341, 352 (2010) ("'An affirmative defense,' however, raises 'a separate issue which may carry a separate burden of proof.'" (quoting Ronald J. Bacigal, *Criminal Procedure* § 17.28 (2007–2008 ed.)).

Brown engaged in sexual relations with C.C., who was married at the time. This fact could have been pleaded by M.C. in the divorce case as a new ground charging adultery, in addition to the ground already alleged in his complaint. Neither of the affirmative defenses argued by Brown would obviate the ground for divorce created by his conduct. At most, condonation or recrimination could have been pleaded as affirmative defenses to the ground of adultery. However, C.C. would have borne the burden of that affirmative defense, and there is no guarantee such defenses would be successful at trial. Put more plainly: while Brown was

15

C.C.'s divorce lawyer, by his own conduct he created a scenario which could have been used to her legal and strategic detriment. Worse, he knew -- or should have known -- the possible consequences of his actions for the case in which he was responsible for zealously and professionally safeguarding the interests of a litigant who was in a vulnerable state given her mental health and substance abuse issues. At the very least Brown should have attempted to mitigate the damage caused by her prior conduct rather than actively exacerbating the situation by being the shameful agent of its resumption.

The circuit court concluded that Brown, through his conduct, created a new or additional ground for divorce in C.C.'s case. Whether or not C.C. and M.C. had reconciled, the additional extramarital sexual relations could still constitute a new or additional ground for divorce against which C.C. would have to defend. As a result, the circuit court's finding correctly stated the possible legal consequences of Brown's conduct for C.C.

### B. VIOLATION OF RULE 1.7(a)(2)

Brown next assigns error to the circuit court's finding that he violated Rule 1.7(a)(2). That Rule provides that

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if : . . (2) there is significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer.

Rule 1.7(a)(2). Paragraph (b) sets forth the requirements for continuing representation with client consent.[11] *Id.* at (b).

---

[11] Brown argues that Rule 1.7(b) implies that Rule 1.7(a) is a curable violation. Assuming, without deciding, that this is true, this distinction is inapplicable to Brown's violation. At no point does Brown argue that he sought to obtain client consent for this conflict, much less address the other required elements under Rule 1.7(b).

Underpinning Rule 1.7(a)(2) is the lawyer's duty of loyalty, and the understanding that when a lawyer's personal interest conflicts with the interests of his client, that duty of loyalty is compromised. *See* Comments [1] and [10] to Rule 1.7. The rule also "reflect[s] the fundamental fiduciary obligation of a lawyer not to exploit a client's trust for the lawyer's benefit, which implies that the lawyer should not abuse the client's trust by taking sexual or emotional advantage of a client." Va. Legal Ethics Op. 1853 at *4. Because the attorney-client relationship is "inherently unequal" a sexual relationship during representation "may provide an opportunity for the lawyer to exploit the client either emotionally, sexually, or financially." *Id.* "Since the attorney-client relationship is based upon trust and confidence, a lawyer has a heightened duty to protect those obligations." *Id.*

Brown argues that this Court has authorized sexual relationships with clients by rejecting a proposed rule which would have made all sexual conduct with clients a per se ethical violation. *See* Virginia State Bar, "Rejected | amendments to Rule 1.8 regarding conflict of interest: prohibited transactions." (March 22, 2023) https://www.vsb.org/pro-guidelines/index.php/rule_changes/item/rule_1.8. We are entirely unpersuaded by that argument; it is fundamentally flawed both as a matter of law and logic. The rejection of a per se rule does not imply that such conduct is always permissible. *See, e.g., Lux v. Commonwealth*, 24 Va. App. 561, 573 (1997) (eschewing a per se disqualification rule in favor of "a more flexible, case-by-case approach").

The record in this case is rife with examples of Brown's personal and prurient interest in his client, which materially limited and weakened his representation of C.C. to her actual and potential detriment. The most obvious detriments were that by engaging in sexual relations with C.C., Brown made himself a fact witness in her divorce case, added a ground for divorce for

17

M.C., and necessitated his own withdrawal as counsel in C.C.'s cases, leaving C.C. to represent herself in her divorce case.

Woven throughout Brown's explicit messages is legal advice, demonstrating that the fiduciary relationship was ongoing and significantly compromised. Most troubling is that a client with significant mental health and substance abuse issues was materially limited in her legal representation because her attorney prioritized his sexual lust over his responsibilities and the client's best interests. This conduct by Brown is the antithesis of what is required in a professional relationship that requires the scrupulousness of a fiduciary.

Brown also claims that, because he withdrew from representation, he has cured any violation under Rule 1.7(a)(2). In support of this argument, he points to Rule 1.16, which, in pertinent part, provides that "a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . the representation will result in violation of the Rules of Professional Conduct or other law." The plain language of Rule 1.16 does not establish a cure provision but, instead, operates as a statement that an attorney has an *additional duty* to withdraw if the representation would violate the Rules. In no way does the requirement of withdrawal equate with the absolution of a violation under a different Rule.

We emphasize that this conflict was not the product of miscommunication between two lawyers in a large firm, leading to inadvertent consultation with opposing parties. This was not an accidental, de minimis, or easily remedied conflict. Rule 1.7(a)(2) implicitly requires attorneys to assess the level of risk involved in their representation of a client to that client's interests; a lawyer's embrace of such risk is adverse to the Rule.[12] Brown engineered the

---

[12] We note that truly inadvertent conflicts, followed by prompt withdrawal, may not run afoul of Rule 1.7. For example, a law firm's corporate client may merge with another company

opportunity for sexual intercourse with C.C. and followed through with his plan. In this case, the violation of Rule 1.7(a)(2) is not a bell which can be unrung by withdrawal. The court's decision regarding the violation of Rule 1.7(a)(2) was sound and supported by substantial evidence in the record.

## C. LENGTH AND DETAIL OF THE MEMORANDUM ORDER

Finally, Brown assigns error to the length and specificity of the circuit court's memorandum order. The Rules provide that a memorandum order must be issued following the disposition of a disciplinary matter. Va. Sup. Ct. R., Part 6, § IV, ¶ 13-18(P). That order must contain "a brief statement of the findings of fact" made in the case. Va. Sup. Ct. R., Part. 6, § IV, ¶ 13-1.

The circuit court's statement of facts, by necessity, summarized extensive contested criminal and domestic litigation, Brown's representation of C.C. in four different matters over the course of three years, and the disturbing facts supporting the finding of misconduct. Brown argues that it was unnecessarily explicit and detailed in its inclusion of text messages. We disagree. The communications between Brown and C.C. directly support the circuit court's misconduct finding and demonstrate the degradation of the attorney-client relationship. As a result, we affirm the circuit court on this assignment.

---

or acquire another company. If, as a result, the firm is now in conflict with that client, that conflict was created through no fault of the firm or the firm's lawyers. Such a conflict may trigger the duty to withdraw under Rule 1.16 but would not trigger a violation of Rule 1.7. Put simply, an attorney cannot assess the risks involved in the representation if they do not know about them, and therefore would not violate Rule 1.7. Yet this example is a far departure from the case before us.

19

The Bar assigns cross-error to the circuit court's finding that Brown did not violate Rule 2.1. Yet, the Bar only requests that this Court "reverse the dismissal of the charged Rule 2.1 violation and find that Brown's conduct also violated Rule 2.1, and leave in place the sanction of a public reprimand with terms." App. Br. at 32. The Bar is only requesting a determination by this Court that Brown violated Rule 2.1, without any consideration of an additional sanction for a Rule 2.1 violation.

Assuming without deciding that Brown violated Rule 2.1, this Court is left between a rock and a hard place with respect to any remedy. The Rules require that, upon a finding of misconduct, "after considering evidence and arguments in aggravation and mitigation, the [circuit court] *shall* impose one of the following sanctions and state the effective date of the sanction imposed: . . . Public Reprimand, with or without Terms." Va. Sup. Ct. R., Part. 6, § IV, ¶ 13-18(M) (emphasis added). A public reprimand is "a form of public discipline that declares publicly the conduct of the Respondent improper, but does not limit the Respondent's right to practice law." Va. Sup. Ct. R., Part. 6, § IV, ¶ 13-1.

Here, the circuit court issued a public reprimand with terms, and the Bar requests no additional sanction from this Court. Under the Rules, an additional finding of misconduct would require a remand for a new sanctions hearing, for the circuit court to "consider evidence and arguments in aggravation and mitigation." Va. Sup. Ct. R., Part. 6, § IV, ¶ 13-18(M). Because no additional sanction is asked for, any finding of misconduct under Rule 2.1 would not be accompanied by a sanction for that violation, in contravention of the Rules.

Relatedly, the public reprimand, a public declaration of misconduct, was issued as a sanction for violating Rule 1.7(a)(2), not Rule 2.1, which was dismissed. This Court cannot

20

simultaneously reverse the circuit court's misconduct finding on Rule 2.1 and leave in place a public reprimand based solely on Brown's violation of Rule 1.7(a). That sanction would directly contradict the 2.1 misconduct finding that the Bar asks us to make.[13]

To resolve these contradictions, this Court would need to remand the case for a sanctions phase encompassing the Rule 2.1 violation. We decline to do so, in light of the fact that the ultimate and actual relief sought by the Bar on appeal has already been awarded by the circuit court below. As a result, we decline to address the circuit court's judgment with respect to Rule 2.1.

## CONCLUSION

The circuit court's finding that Brown violated Rule 1.7(a)(2) is supported by the record. The finding that Brown added a fault ground for divorce against C.C. and the other findings of fact that Brown takes issue with are likewise supported by the record. Additionally, because the Bar requested no additional relief on appeal, we do not reach the court's decision with respect to Rule 2.1. As a result, the circuit court's decision is affirmed.

*Affirmed.*

---

[13] The Bar was explicitly asked multiple times at oral argument about its failure to request additional sanctions, and the necessity of deciding the Rule 2.1 violation. Supreme Court Session Oral Argument Recording at 25:01 to 25:26, 27:33 to 27:41, 27:50 to 28:05, and 28:58 to 29:35 (Feb. 28, 2023). The Bar stated that the reasons for its assignment of cross-error on the circuit court's Rule 2.1 finding were: the absence of caselaw on Rule 2.1, and that it was an important issue in the case. *Id.* at 25:26 to 25:57, 27:41 to 27:50, 28:05 to 28:28, 29:35 to 29:44 (Feb. 28, 2023). The Bar has not argued, on brief or at oral argument, that a Rule 2.1 violation would be relevant in any possible future disciplinary proceeding against Brown. While the Bar may desire further discussion of Rule 2.1, we will not take a longer detour to get to the same destination. Opining on a topic not necessary to the resolution of this case would "represent an attenuated exercise of judicial power in which this Court 'traditionally declines to participate.'" *Hunter v. Hunter as Tr. of Third Amended & Restated Theresa E. Hunter Revocable Living Tr.*, 298 Va. 414, 436 (2020) (citing *Commonwealth v. Harley*, 256 Va. 216, 219 (1998)).